**PUBLISH**

**IN THE UNITED STATES COURT OF APPEALS**

<u>**Filed 8/23/96**</u>

**FOR THE TENTH CIRCUIT**

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 95-3023 |
| | ) | |
| CLAYTON ALBERS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 93-10020-01)**

---

D. Blair Watson, Assistant United States Attorney (Jackie N. Williams, United States Attorney, with him on the brief), Wichita, Kansas, for Plaintiff-Appellee.

Susan L. Foreman, Assistant Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the brief), Denver, Colorado, for Defendant-Appellant.

---

Before **PORFILIO, HOLLOWAY** and **MURPHY**, Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

---

This is a timely direct appeal from the defendant/appellant's conviction and life

sentence for conspiracy to manufacture methamphetamine with intent to distribute in violation of 21 U.S.C. § 846; possession or distribution of ephedrine knowing, or having reasonable cause to believe, that it would be used to manufacture methamphetamine, 21 U.S.C. § 841(d)(2); and manufacture of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). We have jurisdiction under 28 U.S.C. § 1291.

Defendant Clayton Albers was originally indicted on February 24, 1993, along with Michael Marino, Janet Raisner, Patrick Cambron, Joe Vergilio, Jack Francis, and Anthony Feher. James Randa was added as a conspirator in the second superseding indictment. All seven of the others indicted eventually entered guilty pleas and defendant Albers proceeded to trial in November and December of 1993. That first trial resulted in a mistrial because the jury could not reach a verdict. In a second trial in September 1994, defendant Albers was convicted on all three counts of a third superseding indictment. He received a life sentence and now brings this appeal.

# I

## FACTUAL BACKGROUND

### A

The government presented evidence at trial tending to show that the original defendants, who all had entered guilty pleas, were involved in a venture to manufacture methamphetamine for distribution. Patrick Cambron, a nephew of defendant Albers, was the first prosecution witness. Cambron testified that while incarcerated in California in 1990,

he was told by another inmate some of the basics of making methamphetamine. Cambron decided to try to get involved in manufacturing methamphetamine after his release.

To do so, Cambron needed to find a source for ephedrine, a precursor chemical. In February 1991, shortly after his release, Cambron attended the wedding of his brother in Houston. Defendant Albers, who lived in Wichita, Kansas, and had not seen Cambron in several years, also attended the wedding. Defendant and Cambron conversed at the wedding reception. Cambron testified that he learned then that defendant Albers had started a fertilizer business in Wichita called Agri-Data. During this conversation Cambron brought up the possibility of obtaining ephedrine to be used in the manufacture of methamphetamine. Cambron told defendant that after manufacture, each pound of methamphetamine would be worth about $10,000. Cambron testified that defendant said he was interested and that if Cambron came up with the money he should call defendant. (XII R. at 80-82.) Cambron told defendant that as a legitimate reason for ordering ephedrine, the cover story could be that it could be used in poultry feeds. (Id. at 83.)

Cambron testified that he contacted others and raised ten thousand dollars from Michael Marino and Jack Francis with which to purchase ephedrine. Cambron and Marino flew to Wichita to meet with defendant. (Id. at 86-92.) Upon first arriving in Wichita, Cambron met with defendant at a restaurant. Cambron said that he agreed that defendant would be paid $50,000 and that Stuber, a business partner of defendant in Agri-Data, would be paid $15,000 out of the proceeds if the ephedrine could be obtained. Stuber later joined

3

them at the restaurant. (Id. at 94-95.) Among other things, defendant Albers, Cambron, and Stuber discussed what explanation could be given for ordering quantities of ephedrine, including Cambron's idea of saying it was to be used as poultry feed and the suggestion discussed by defendant and Stuber that they could say it was to be used in the fertilizer business as a plant growth regulator. (Id. at 92-96.) Later Cambron introduced defendant to Marino, and $10,000 was given to defendant by Marino for the cost of the chemical. (Id. at 98.) Marino soon returned to his home in California, but Cambron stayed in Wichita at defendant's apartment for several weeks to obtain the chemical, during which time he was frequently in the offices of Agri-Data in Wichita.

Cambron began trying to find a chemical company from which to purchase ephedrine. Cambron tried telling one company that he wanted ephedrine to use in poultry feed, but that company advised him that the FDA did not approve of that use of ephedrine. Cambron eventually contacted a chemical supplier in New Jersey which said that it could provide ephedrine. Defendant then made arrangements by telephone to initiate an order for four drums of ephedrine, for which a company check from Agri-Data was issued. Defendant signed a form indicating he was aware that ephedrine was a precursor chemical subject to drug trafficking laws and that the ephedrine was to be used as a plant growth regulator in the company's business. (Id. at 316-18; XIV R. at 930.) The supplier contacted the DEA, which told him to fill the order but to let the DEA know if a second order was placed.

The ephedrine was shipped to Agri-Data in four barrels in mid-May 1991. Cambron

4

had gone several times to Agri-Data's facility in Belle Plain where the fertilizer plant and storage tanks were. (Id. at 102.) Cambron and defendant were present when the delivery was made to the Belle Plain facility, and Cambron testified that he immediately removed the identifying labels from the barrels to prevent employees from speculating about why the company had ordered ephedrine. In court, Cambron identified the four drums which were exhibits. (XII R. at 113.) Cambron said that in the middle of the following night, Cambron and defendant went back to the plant and, according to Cambron, repackaged the chemical in cardboard boxes. Cambron said they checked the barrels for tracers or tracking devices. Cambron said defendant Albers held each drum and tipped it up, and Cambron sifted through it with his hands to make sure there was nothing in the powder. They refilled the barrels with potash and a very small amount of ephedrine to provide credence for the cover story that the ephedrine was being used in fertilizer. (XII R. at 111-18.) (Cambron's testimony that defendant Albers returned with him late at night to the plant and went through the drums was flatly denied by defendant.) (XIV R. 939.)

Cambron then shipped the boxes of ephedrine to Marino in California and traveled there separately. The ephedrine was used by Francis and perhaps others to manufacture a large quantity of methamphetamine. Cambron was involved in distribution of much of the methamphetamine manufactured from the ephedrine. Cambron eventually sold about 80 pounds of methamphetamine for a total of approximately $800,000. (Id. at 128-29, 212.) Cambron testified that he sent, directly or through others involved in the scheme, $37,000

5

in eight separate wire transfers to defendant. (Id. at 134-37.) Cambron also arranged for the shipment to defendant of a Federal Express package containing $15,000. In addition, Cambron testified that defendant traveled to California at least once to receive more of the proceeds, getting about $20,000 on that occasion. (Id. at 132-34, 139-42.) Mike Marino and Joe Vergilio gave testimony regarding their involvement in some of these payments to defendant. As discussed below, there was also evidence introduced during cross-examination of the defendant that he received a cashier's check for $5,000 on another occasion. (XIV R. at 984-986.)

Two former employees of Agri-Data testified that during the summer of 1991 defendant brought a large amount of cash to the office. Sarah Downey was the bookkeeper for Agri-Data from the time of its formation in late 1990 until March 1992. (XIII R. at 471-72.) Ms. Downey testified that the company was experiencing constant cash shortages during the spring and summer of 1991. (Id. at 476.) She said that once during this time she told defendant that some bills were due, including one for a purchase of fertilizer, and that the company did not have the funds to pay these bills. Defendant told her he would take care of it. He left the office and returned a short time later with a large amount of cash, which she estimated to be about $15,000. She testified that defendant said he did not want to deposit the cash into the bank because the bank would have to report a cash deposit of over $10,000. (Id. at 477-78.) She said that defendant asked several employees if they would write checks on their personal accounts and take some of the cash so that the company could deposit their

6

checks instead of cash. A customer's check was received shortly thereafter, however, and the idea of taking checks from employees was never implemented. (Id. at 478-79, 482.)

A few weeks after receipt of the ephedrine, Cambron was arrested in California for attempting to trade methamphetamine for marijuana. Released on bond, Cambron continued selling methamphetamine. Cambron returned to Wichita sometime in late July or early August, 1991, and stayed with defendant for about a week. Cambron said that he, defendant and Stuber discussed a second purchase of ephedrine during this time and planned to try to buy twice as much as they had the first time. (XII R. at 143-46.) Cambron testified that he later sent $10,000 to defendant for a second purchase. He said that he arranged through Joe Vergilio to have a friend of Vergilio's, Vickie Arias, deliver the money to Wichita in late August, 1991. (Id. at 149-153.) Cambron said that he talked with defendant on the telephone to arrange for defendant to meet Arias at the airport and, after her arrival, had a telephone conversation in which defendant confirmed receipt of the money. (Id. at 152-53.) Vergilio testified about participating in these arrangements. Vergilio also testified that Cambron had lived with him during parts of the summer of 1991. He said that he once received a telephone call from defendant in which defendant first asked for Cambron, who was not there at the time, and then asked Vergilio to tell Cambron to hurry and send the money for the second purchase. (XIII R. at 586-87.)

Vickie Arias testified that she flew to Wichita at the request of Vergilio and Cambron and delivered money to defendant, although she believed the amount had been only about

7

$2,500. (Id. at 333-37, 343; XIII R. at 597.) The manager of the Motel 6 in Wichita identified a registration card that had been filled out on August 23, 1991, which was then shown to the jurors. Defendant later testified that he registered for a room after meeting Arias at the airport because she was "tipsy," but defendant denied that he received any money from Arias or that her trip had anything to do with ephedrine or methamphetamine, to his knowledge. Defendant said that Arias had arrived very early in the morning, about 5:30 or 6:00 a.m. XIV R. at 946-48 994-97.

An officer of the chemical supply company testified about filling the first order for ephedrine. He testified that he first talked on the telephone with someone identifying himself as Pat concerning the company's ability to supply ephedrine, and the next day received a telephone call from someone identifying himself as Clayton. He also testified that a second order for ephedrine was placed by defendant which was dated August 29, 1991, and received by his company on September 4, 1991. (This second order was for 100 kilograms as in the first order, rather than the larger amount which had been discussed.) The supplier was instructed by the DEA not to fill the second order. (Id. at 322-24.)

Over the Labor Day weekend, 1991, just after placing the second order for ephedrine, defendant went to California again. According to Cambron, defendant met there with Cambron and others involved in the scheme to discuss Cambron's arrests (he had been arrested a second time by then) and the second order for ephedrine. (Id. at 157, 322-24; XIII R. at 519.) Cambron, Vergilio and Marino all testified that the group, including

8

defendant, met first at a restaurant and then went to a motel room to continue their discussions in greater privacy.

Officer Michael Clark testified that he was with the Wichita Police Department and was assigned to work with the DEA task force. As a result of the ephedrine supplier's notification to the DEA about Agri-Data's second order for ephedrine, the task force began an investigation. On September 5, 1991, just after defendant returned from California, Officer Clark and DEA Agent Stansbery came to Agri-Data's Wichita office to inquire about the orders for ephedrine. (XIII R. at 657-58.) The two officers interviewed defendant and Scott Stuber. Officer Clark testified that defendant's language was very calm but his hands were shaking very much. (Id. at 659.) Defendant told the officers that the ephedrine had been used in an experimental fertilizer program and showed them field maps purporting to show where the mixture containing ephedrine had been applied to crops. Clark testified that defendant told them that all of the ephedrine had been used and that the experiment was the idea of Dr. Joe Waters, an agronomist who had served as a consultant for Agri-Data. (Id. at 660-61.) When asked about Patrick Cambron, defendant said that he had not seen Cambron since the wedding in Houston in February. (Id. at 662-63.)

Officer Clark later went to Agri-Data's Belle Plain facility and asked Donald Guthrie, the employee in charge there, about the ephedrine. Guthrie showed Clark the four barrels. Although defendant had said that the ephedrine had been dumped out of the barrels and mixed with potash, the barrels were not empty. (Id. at 665-68.) The barrels were later

9

seized, and chemical analysis revealed that the barrels contained mainly potash and less than 1% ephedrine. (XIV R. at 782-84.)

Officer Clark also testified that records of long distance telephone calls from five sources had been obtained and analyzed. The records were from the Agri-Data office in Wichita, defendant's residence, Agri-Data's mobile telephone, the residence of Joe Vergilio in California, and Mike Marino's residence in California. (XIII R. at 685.) A chart summarized the results of the analysis, showing the date and time that each call had been made, the length of time elapsed during the call, and the total number of calls between each of the Wichita numbers and each of the California numbers. This evidence showed that frequent contact was being made between Wichita and the two California residences during the relevant time period, although of course such evidence could not discern between calls made to or by defendant and those made to or by Cambron during the time that he was in Wichita. Among the calls shown by these records were two from the Agri-Data mobile phone to Vergilio's residence, one on August 21, 1991, and the second one two days later. Officer Clark first testified that this second call had been made at 4:47 p.m. (id. at 688), but then testified that he had made a mistake and that the records actually showed that this call had been placed at 4:47 a.m. on August 23rd (id. at 712, 739). The Motel 6 registration card showed that defendant had registered there on August 23rd. (Id. at 688-89.)

Dr. Joe Waters was a prosecution witness. He testified that he is an agricultural consultant with a Ph.D. in soil science and agronomy. (XIII R. 741.) He said agronomy

10

basically is the growing of plants and the structure of plants and producing crops, and soil science is a study of soils and the interaction of chemicals in soils and fertilizers to produce the crop. Dr. Waters said he has approximately five years of background in chemistry. (Id. at 741-42.) Dr. Waters said that he knew defendant Albers because he and Scott Stuber acquired Waters' services and those of an associate of his to become their consultants in about 1991. Waters testified that he did not provide any fertilizer formulas to Albers that contained or utilized a drug known as ephedrine. (Id. at 743.)

Dr. Waters testified that in the last seven or eight years he had spent probably 60% of his time in research on fertilizers alone and plant growth regulators. (Id. at 743.) He said that in addition to his own experimentation in fertilizer and compounds that enhanced plant growth regulators, he had read scientific studies and conclusions of others in that area. (Id. at 744.) He has worked with some of the better consultants in the United States, and he said that he is recognized as the number three consultant in California. (Id. at 745.) He has co-authored a "Western Fertilizer Handbook" used as a text in 15 universities. He testified he has never heard of a drug known as ephedrine being used as a plant growth regulator. (Id.) Dr. Waters said that what they were trying to do with Agri-Data was to use modern technology used in the United States to put preplant fertilizer down with the seed. (Id. at 747.) He added that if a fertilizer test for a new combination of ingredients for fertilizer was to be conducted, and someone else's land is to be used, you must have the landowner's permission before the test is conducted. If the wrong product was being tested, the soil could

11

be sterilized and basically ruined in testing. (Id. at 749.)

Cambron was rearrested on the California charges of attempting to trade methamphetamine for marijuana and was imprisoned there from January to September 1992. He was contacted there about cooperating with the investigation of Agri-Data. He initially declined. However, upon learning that others were being subpoenaed to appear before a grand jury in Wichita, he contacted law enforcement. Then, after being subpoenaed himself, he implicated defendant. As part of his cooperation with the government, he agreed to place telephone calls to the defendant which the authorities tape recorded. He identified the transcripts of two of these recorded conversations, which took place on October 20, 1992, and November 4, 1992. The tapes were then played for the jury during his testimony and were replayed, at least in part, during the government's cross-examination of the defendant. (XII R. at 162-181.)

Much of the recorded conversations was rather cryptic, and Cambron was asked to explain portions of them. The portions of the conversations which the government emphasized dealt with the pending grand jury investigation. In the first call Cambron informed Albers that grand jury subpoenas had been received by his then wife, Michelle Cambron, and by Janet Raisner, who was Marino's wife. He also told defendant that agents had interviewed Joe Vergilio at his home. (VI Supp. R.) Cambron told defendant that the agents had asked Vergilio about wire transfers, to which defendant responded, "Oh, you're kidding."

In the second taped conversation, Cambron informed defendant that Michelle Cambron, Janet Raisner, and Joe Vergilio had indeed testified before a grand jury in Wichita. Cambron said that he had talked with Michelle after her return from Wichita and told defendant a few subjects he had learned that the grand jury had probed. (VIII Supp. R.) These included the "little meeting that took place in a motel room," which Cambron testified was a reference to the meeting which had occurred on defendant's second trip to California. {XII R. at 179.) Defendant had again responded with "You're kidding." (As discussed below, defendant testified that on his second trip to California he met with Cambron and others in a restaurant, but denied that he went with the group to continue the meeting at a motel room.) Defendant later mused, "Where did that ever come up at? How did it ever come up?"

Cambron then is heard on the tape telling defendant that the authorities had photocopies of wire transfers. Defendant's response was, "Oh shit. Is that right?" After Cambron responded simply, "Yeah," defendant said in the taped conversation: "Well, somebody's sure doing a lot of talking." Cambron also told defendant in this conversation that the grand jury had asked about "some kind of initial deal of ah . . .50 here, 15 there? You know?" Defendant's only response to that was, "Okay." Cambron testified that this had been a reference to the original agreement that defendant would receive $50,000 of the proceeds from methamphetamine sales and Stuber would receive $15,000. (XII R. at 179-180.) Early in this second conversation, defendant is heard telling Cambron to "be careful

of what you say." Cambron responds by saying, "Well, gonna do that, but I'll let you know I've got my big phone system on." (Id.) Cambron testified that he had had several conversations with defendant when he had been in Wichita concerning a "tap detector" and "about we need devices." (XII R. at 162.)

**B**

As noted earlier, the initial indictment of defendant Albers and the other original defendants occurred on February 24, 1993. After the first trial produced a mistrial, the second trial occurred in September 1994. There, defendant Albers testified he was unaware of Cambron's plan to use the ephedrine to manufacture methamphetamine. Defendant testified that Cambron had persistently and enthusiastically advocated experimenting with ephedrine in fertilizer. Defendant said that he eventually consented partly because he wanted to convince Cambron to come to work for Agri-Data and thought that agreeing to his suggestion would serve as an inducement to Cambron. (XIV R. at 927.) He testified that Cambron seemed knowledgeable about chemicals and that he knew Cambron had worked with chemicals in his father's hazardous waste disposal business and when he had worked with a company that serviced swimming pools. (Id. at 917.)

Defendant's position was that Patrick Cambron had tricked him into ordering the ephedrine by touting the prospect of using it experimentally as fertilizer, and that Cambron then stole the ephedrine from the Belle Plain storehouse and shipped it to California for the purpose of methamphetamine manufacturing. Defendant admitted that he had gone to the

14

storehouse late at night and emptied the contents of the barrels into bins filled with potash, but explained that it was not unusual for him to work that late and that he wanted to keep the experiment a secret from most of his employees in case it turned out well and became a commercially valuable formula. (XIV R. at 934-38). Defendant said that after he had used the conveyor belt to dump the ephedrine into the potash bins, he then scooped a few shovelfuls of the potash and ephedrine mixture back into the barrels to have samples. Defendant further testified that the potash and ephedrine mixture was later liquefied in preparation for its use on crops. Defendant Albers and Stuber both testified that the mixture defendant had made with potash was applied to customers' fields.

Defendant testified that the money he received by wire was in repayment for a $20,000 loan he had made to Cambron. Defendant Albers said that Cambron had told him that he had decided to return to California and go into the garage door business instead of becoming an employee of Agri-Data. Cambron asked for the loan to get him started in the business and said he could repay the money in a short time because he was owed that much by his brother. Defendant said that Cambron had even promised to repay him double the amount of the loan and did eventually send him $37,000, as the government's evidence of wire transfers had shown. (Id. at 938.)

Defendant admitted having made two trips to California during the summer months after the ephedrine had been received. He said that he made the first trip because Cambron had invited him to visit California, and he decided to do so since he had been planning a trip

15

to Las Vegas anyway and could easily visit California at the same time. Defendant produced a hotel receipt from Las Vegas showing that he had been there on the night of July 13, 1991. (Id. at 941-42.) He said that he won about $22,000 gambling in Las Vegas and had bragged about his good fortune when he returned to Wichita, showing the money around the office. (Id. at 943.) Defendant said that his second trip to California, over the Labor Day weekend of 1991, was in response to calls he had received from several people telling him that Cambron had been arrested and was in a lot of trouble. Defendant admitted meeting with Cambron and others at a restaurant during this California trip, but denied that he went with the group to a motel room to continue the discussions, as others had testified.

Defendant admitted meeting Vickie Arias at the airport in late August, but said that she had come only to retrieve the objects Cambron had left behind after his week-long visit earlier that month. (Id. at 946-949.) He said that Cambron had called him to explain that he was sending someone after his possessions.

Defendant also testified about his interview with Officer Clark and DEA Agent Stansbery just after his return from California, on September 5, 1991. Defendant said that he had explained to them the experimental use of ephedrine that he had conducted. He denied having told the agents that Dr. Waters had come up with the formula for the ephedrine mixture; he testified that he had told the agents instead only that the ephedrine had been added to a formula Dr. Waters had earlier developed. He admitted that he lied about not having seen Cambron in several months. He said that he was shocked and confused at the

16

sudden mention of Cambron's name at the end of the interview and concerned about Cambron because of what he had just learned about Cambron's arrests in California. (Id. at 956.)

On cross-examination defendant admitted that he did not know how Cambron would have learned about fertilizers while working with hazardous waste disposal and in swimming pool maintenance. (Id. at 970.) He said that the $20,000 he had loaned Cambron was part of approximately $33,000 that he had been keeping in his vacuum cleaner at home. Defendant said that he preferred keeping cash at home to keeping it in a bank just for the convenient access to the cash, not because he admittedly owed the government several thousand dollars in back taxes. He admitted that he was aware that the government could levy on bank accounts to collect back taxes, however. (Id. at 976-77.) Defendant reaffirmed that the total he had received from Cambron was $37,000. Confronted with a cashier's check in the amount of $5,000 he had received and deposited in June 1991, which the government showed had been purchased by Michael Marino, defendant testified that he had no recollection of receiving the check and no explanation for it. (Id. at 984-87.) Defendant conceded that it would have been a "rare event" for him to have received a cashier's check in this amount made to him personally. (Id. at 1041.)

Scott's Stuber's testimony was generally consistent with that of defendant Albers in explaining the decision to order the ephedrine for experimental purposes. Stuber testified that after defendant Albers got back from his Houston trip, Albers and Stuber met with

17

Patrick Cambron at a Denny's restaurant in Wichita. Cambron suggested that Agri-Data might investigate the use of ephedrine as a plant growth regulator. (XIV R. 846.) It "stemmed" from Joe Waters to defendant Albers, Albers then had talked to Patrick Cambron, and Cambron then talked to Albers in Houston about the ephedrine experiment. (Id. at 845.) Stuber said that he had researched literature on fertilizers and found very little information except a single reference in one journal indicating that the ephedrine idea had potential. Stuber testified that Agri-Data did ultimately decide to experiment with ephedrine. (Id. at 848-49.) Stuber admitted that permission had not been sought from the landowners where the experimental mixture was said to have been applied. (Id. at 883-84.) Stuber said that he could not identify the landowners or the locations of their fields without consulting records. Stuber testified that he had not consulted with Dr. Waters or with anyone else regarding Cambron's idea for the ephedrine experiment. Stuber said he never agreed with defendant Albers or Cambron or anyone else to manufacture methamphetamine or to procure ephedrine knowing it would be used to manufacture methamphetamine. (Id. at 863.) Stuber said that he was not involved in sending ephedrine to California to be made into methamphetamine and that he did not believe defendant Albers was so involved. (Id. at 895-96.)

After defendant Albers' convictions at the second trial, at sentencing Albers was given a four-level enhancement for being a leader or organizer of the criminal activity, which was challenged below and is disputed on appeal, and a two-level enhancement for obstructing justice by giving perjured testimony, which is not challenged. He received a life sentence.

18

## II

## THE CLAIM OF ERROR UNDER FED. R. EVID. 609(a)(1)

Defendant testified in his own defense at trial. His first contention on appeal is that during cross-examination, the prosecutor made impermissible use of his prior conviction. Having conceded in a motion in limine that defendant's previous felony conviction for theft of property held in trust was admissible for purposes of impeachment under Fed. R. Evid. 609(a)(1), defense counsel chose to reveal the essential facts of the conviction himself during defendant's direct examination:

Q: Now, when you were in South Dakota did you get in trouble?

A: Yes, I did.

Q: Would you tell the ladies and gentlemen of the jury what you were convicted of?

A: I was convicted of grand theft property in trust.

Q: Did you go to prison as a result of that?

A: Yes, I did.

Q: For how long?

A: 33 months.

(XIV R. at 912-913.)

On cross-examination, the following exchange occurred when the prosecuting attorney turned to the subject of Albers' prior theft conviction:

Q: Now, was it when you were in Western Fidelity Life that you had the little

19

problem with the law that resulted in a felony conviction?

[Albers' attorney MONNAT]: May we approach, Your Honor? Objection.

THE COURT: On what grounds?

MR. MONNAT: Beyond the scope.

THE COURT: Beyond the scope. Overruled.

Q: [By the prosecutor, Mr. Watson] What company did you work for when you were convicted of grand theft?

A: Crop insurance companies in South Dakota.

Q: And that conviction concerned you taking farmers' money for crop insurance and not sending the premiums or the applications back to the insurance company, didn't it?

A: Yes.

Q: And everything was all right until, of course, storm comes up and the farmers' crops are destroyed and you haven't sent in any insurance premiums, right?

MR. MONNAT: Objection, Your Honor, that the underlying facts are irrelevant.

THE COURT: The objection is overruled.

Q: (By Mr. Watson) Isn't that what happened?

THE COURT: Admit the question for purposes of testing the witness's credibility.

Q: (By Mr. Watson) That's what happened, wasn't it?

A: Yes.

(Id. at 964-65; emphasis added).

Defendant contends that the trial judge erred in permitting the government to develop the underlying facts regarding his South Dakota conviction relying, *inter alia*, on United States v. Wolf, 561 F.2d 1376 (10th Cir. 1977), which years ago staked out the limits on use of a prior conviction under Fed. R. Evid. 609(a).  The rule provides:

> For the purpose of attacking the credibility of a witness, (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and (2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

In Wolf we adhered to the already well-established rule prohibiting examination into the underlying facts of prior convictions in recognition of the extremely high potential for unfair prejudice posed by such evidence.  Judge Pickett explained that:

> Ordinarily, it is improper for the prosecution to examine into the details of the crime for which the accused was convicted.  The cross-examination should be confined to a showing of the essential facts of convictions, the nature of the crimes, and the punishment.  Care should be taken to protect the accused as far as possible from being convicted because of past conduct and not the crime for which he is being tried.

561 F.2d at 1381.

The government says that the defense failed to object specifically under Fed. R. Evid. 609 to the questioning, making the ruling reviewable only for plain error.  The objection as originally worded did not cite the rule or make a specific objection under it.  The initial

objection that the cross-examination was "[b]eyond the scope," presented only the general theory of the limitations under Rule 609. But as the prosecutor moved on to bear down on the damaging facts underlying the prior conviction, the objection was spelled out and did make clear the defendant's objection that "the underlying facts are irrelevant"; *i.e.*, the taking of farmers' money for crop insurance, not sending the premiums to the insurance company, and storm damage resulting in the farmers having uninsured losses. The objection was stated clearly under the Wolf rationale that "the underlying facts are irrelevant." (XIV R. at 965; emphasis added.)[1]

The defendant's objection to developing the damaging "underlying facts," brought home the essence of defendant's position to the court and the prosecutor early on. The objection was overruled and the details were left before the jury, which the judge said was "for purposes of testing the witness's credibility." However, the defendant was entitled to the protection of the rule that only the prior conviction, its general nature, and punishment of felony range were fair game for testing the defendant's credibility. The further damaging details the prosecutor spelled out were not. Developing such underlying facts violated the limitations of Rule 609(a)(1) and Wolf. See also United States v. Gordon, 780 F.2d 1165, 1176 (5th Cir. 1986) (after showing of previous offenses, cross-examination properly limited

---

[1]We also note that in Wolf we cited with approval United States v. Harding, 525 F.2d 84, 88-89 (7th Cir. 1975), in which then-Circuit Judge, now Justice, Stevens said: "The rule that it is error to inquire about the details of prior criminal conduct is so well established that such error is cognizable despite the absence of any objection by defense counsel."

22

to exclude attempted questions about "<u>particular facts of</u> . . . <u>previous offenses</u>")(emphasis added).  Here, the objection was made adequately clear and error occurred when it was overruled and the inadmissible details were left before the jury.

We must, therefore, determine whether the error was harmless.  <u>See</u> 28 U.S.C. § 2111.  In doing so, we are guided by the venerable teachings of <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946), which applied the similar statutory predecessor to § 2111.  In particular we follow the Court's familiar instruction on harmless error analysis:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress.  But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.  The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.  It is rather, even so, whether the error itself had substantial influence.  If so, or if one is left in grave doubt, the conviction cannot stand.

<u>Id.</u> at 764-65 (footnote and citation omitted).

In applying the <u>Kotteakos</u> test of harmless error, we note first that the prosecutor improperly bore down heavily on the inadmissible damaging facts underlying the prior conviction when he cross-examined defendant Albers.  And, as defendant argues, the prosecutor repeated them in his final argument.  On the other hand, we have before us the impressive strength of the array of documentary and testimonial evidence against defendant Albers showing his involvement in the conspiracy and the methamphetamine venture, and

23

persuasive evidence contradicting and impeaching Albers as detailed in Part I, *supra*.

The defendant's version of the facts, which the jury obviously did not believe, inherently lacked credibility. First, the defendant's testimony was that he and his partner decided to embark on the experimental use of ephedrine despite the lack of any reason to believe that the substance had agricultural usefulness. Although they had sought out the highly capable assistance of an expert, Dr. Waters, on previous occasions, they decided on the claimed ephedrine experiment without consulting anyone. And to implement this program they were willing to invest first $10,000, then a like amount on a second occasion at a time when their company was in strained financial circumstances. All this was supposedly based on the enthusiastic recommendation of Cambron, who had no experience in agriculture generally or fertilizers specifically, and in the hope that conducting the experiment would induce Cambron to accept employment with Agri-Data. This latter hope, of course, could not even conceivably have pertained to the decision to order a second shipment of ephedrine because Cambron had moved back to California more than three months before the second order was made. The purported decision to loan $20,000 to Cambron from his "vacuum cleaner" cache -- allegedly made before the claimed good fortune of winning some $20,000 gambling in Las Vegas -- and Cambron's alleged generous offer to repay the loan and an additional $20,000 in a short time, both are similarly difficult to accept. Defendant's explanation for bringing a large amount of cash into the office -- the claimed gambling winnings -- was not supported by the testimony of the two former

24

employees who testified for the prosecution, even though defendant testified that he bragged exuberantly about his good fortune.

Defendant's inability to recall receiving the $5,000 cashier's check, receipt of which he admitted would have been a "rare event" for him, weighs heavily against his story. Defendant's explanation that Cambron had sent Vickie Arias by airplane from California merely to pick up personal items he had left behind, in addition to its facial implausibility, left the impression that the sequence of events -- the call to Vergilio's residence, Arias' arrival, the 4:47 a.m. call to Vergilio's residence immediately following her arrival, and the placement of the order for the second shipment of ephedrine just days later -- was merely a string of coincidences.

Continuing to review carefully all of the evidence, we note defendant's highly incriminatory expression of surprise and dismay in the recorded telephone conversation with Cambron when informed that the government had asked about wire transfers when interviewing Vergilio and his warning to Cambron at the beginning of the second conversation to be careful in what was said. Defendant also admitted lying to the investigators in his first contact with them when asked about Cambron. And there was also the testimony by Officer Clark that Albers said Dr. Waters had suggested a fertilizer experiment with ephedrine and testimony by Dr. Waters, denying such a suggestion was made by him and stating he had never heard of such a use of ephedrine. We also think it significant in this context that facts underlying the prior conviction which were improperly

25

developed did not involve a controlled substance offense. Finally, the jury was instructed that the prior conviction was not to be considered as evidence of guilt in this case.

We are mindful, of course, that the jury's verdict here must have rested very heavily on the credibility determinations that the jurors made and that the erroneously developed facts constituted an improper additional weapon in the government's attack on this defendant's credibility. Nevertheless, on this record we are satisfied that the error in developing the details underlying the prior conviction here would have had very slight, if any, effect on the jury's verdict and therefore was harmless. See United States v. Wolf, 561 F.2d at 1382 (citing Kotteakos); see also Tuttle v. State of Utah, 57 F.3d 879, 884 (10th Cir. 1995) (applying harmless error standard of Kotteakos).

## III

## THE CLAIM OF ERROR UNDER *TOME*

Defendant next argues that the district court erred in admitting evidence of prior out-of-court statements made by two of the government's witnesses. In both instances the evidence was admitted under Fed. R. Evid. 801(d)(1)(B), which provides:

> A statement is not hearsay if -- (1) the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . .

Defendant concedes that his cross-examinations of the two witnesses raised a charge of recent fabrication or improper motive. Defendant's argument that the statements were

26

nevertheless erroneously admitted is based on the "pre-motive" requirement. Under the "pre-motive" requirement, a prior consistent statement is not admissible unless the prior statement was made before the motive to fabricate arose. At the time of trial, this circuit had only recently rejected the pre-motive rule, but that holding was reversed by the Supreme Court during the pendency of this appeal. United States v. Tome, 3 F.3d 342 (10th Cir. 1993), rev'd, 115 S.Ct. 696 (1995). The Supreme Court held in Tome that Rule 801(d)(1)(B) incorporated the pre-motive requirement of the common law. Thus, a witness's prior consistent statement may not be admitted to rebut a charge of recent fabrication or improper motive unless the out-of-court statement was made before the alleged motive to fabricate or the alleged improper influence or motive arose.

Although the trial court's rulings were correct when made, it is clear that the Supreme Court's holding in Tome must be applied here. See Griffith v. Kentucky, 479 U.S. 314, 328 (1987) (new rule for the conduct of criminal prosecutions is to be retroactively applied to all criminal convictions pending on direct review or not yet final at the time of its pronouncement); United States v. Lang, 81 F.3d 955, 962 (10th Cir. 1996). On this point, the government's argument in its totality consists of the statement that the district court could not have abused its discretion by adhering to the law as it then existed. This of course is clearly unpersuasive. The Griffith rationale and Lang make it very clear that we must apply the Tome decision of the Supreme Court. Accordingly, we must determine if the trial court's rulings were incorrect under the pre-motive rule we must follow.

27

The first of the two challenged rulings concerned testimony of one of the investigating officers, Officer Clark, in which he was permitted to relate a prior consistent statement by one of the prosecution's key witnesses, Patrick Cambron. Clark had contacted Cambron while the latter had been imprisoned in California in 1992 to see if he would cooperate with the investigation. Cambron had refused. After his release from prison in October 1992, however, Cambron had called the DEA to express his change of mind and willingness to cooperate. Defense counsel's cross-examination of Cambron, the first witness in the trial, had effectively demonstrated that Cambron had lied under oath before, had frequently lied to gain an advantage, and had avoided exposure to a potential life sentence by entering into his plea agreement with the government. The cross-examination had essentially implied that Cambron's testimony which implicated Albers had been fabricated.

To rebut this charge of recent fabrication or improper motive, the government offered Officer Clark's testimony about his October 1992 interview with Cambron. Defense counsel made a timely objection and argued that the motive for Cambron to fabricate had already arisen by the time he offered to cooperate with Officer Clark. (XIII R. at 669-74.) The government did not then contest this premise of defendant's argument, but now argues that defendant's cross-examination established that Cambron's motive to fabricate arose after the statements to Officer Clark in connection with the formal plea agreement and Cambron's hope that the government would still file a motion for reduction of his sentence under Fed. R. Crim. P. 35. We are unpersuaded. Cambron had admitted in his testimony that he

28

did not agree to talk with law enforcement until he had become afraid that all the others involved in the conspiracy would testify against him. (XII R. at 217.) We find no reason to doubt that Cambron's statements to Clark came after Cambron had a motive to falsify. Consequently, we think it clear that under the Supreme Court's <u>Tome</u> ruling we must regard as error the overruling of defendant's objection.

The testimony of Officer Clark which was admitted as a result of this first ruling consisted of the following:

> Q: Can you tell us during the -- I believe you said the October 19th or 20th statement of 1992, you took from Mr. Cambron, can you tell us generally what it was he said concerning his involvement with the Defendant and the ephedrine?
>
> A: He said that he had met with the Defendant, that they had discussed getting these chemicals.
>
> Q: By these chemicals, you mean what?
>
> A: Meaning the ephedrine. Discussed getting the ephedrine. Hiding the fact that they were getting it by saying they were going to put it in a fertilizer, and then they would ship it to California where it would be made into methamphetamine and that there could be large profits made.

(XIII R. at 675.)

The second piece of evidence admitted at trial as a prior consistent statement and challenged here concerned a letter which Mike Marino had written to the trial judge. On direct examination Marino had testified that while he had been in Wichita with Cambron to deliver the money for the first purchase of the ephedrine to the defendant, defendant had made a statement that Marino had taken as a threat. Defendant's statement, according to

29

Marino's testimony, had been to the effect that because he had been in prison twice before, "if we were to get busted and tell on him that we'd be through." (XIII R. at 529-30.)

As with Cambron, defense counsel cross-examined Marino vigorously regarding the benefits of his plea agreement and his previous denial of any involvement in a methamphetamine conspiracy. Defense counsel then asked defendant if he had ever before told law enforcement personnel about defendant's threatening statement. Marino said that he had told Officer Clark and another officer. (Id. at 545.) On re-direct examination the prosecution was allowed to have Marino read the letter now in question to the jury. The letter was primarily focused on Marino's complaints about the performance of his attorney. The statement for which the letter was admitted was: "I want to testify on Clayton Albers but I am worried he might do something to me." (Id. at 574.) Defense counsel had objected to this evidence both on the grounds of the pre-motive rule under Fed. R. Evid. 801(d)(1)(B) and that the probative value of the evidence was substantially outweighed by its prejudicial effect under Rule 403. (Id. at 555, 564-65.) The court overruled the objection on the grounds that the letter was a prior consistent statement and also decided *sua sponte* to instruct the jury that the letter was to be considered only as pertaining to Marino's credibility and not for the truth of the matter asserted. (Id. at 565-67.) Rule 801(b)(1)(B) currently permits a properly admitted prior statement to be considered for the truth of the matter asserted, not just as bearing on credibility. Tome, 115 S.Ct. at 701.

The letter at issue was written after Marino's guilty plea had been accepted and after

30

he had been sentenced. Defendant argues, as he did at trial, that Marino still had a possible motive to fabricate as he was asking the court to appoint him a new lawyer and allow him to appeal his sentence. Defendant also raised at trial the fact that Marino hoped to have the government file a motion on his behalf for reduction of his sentence. The district judge apparently concluded that Marino had a motive to falsify at the time that he wrote the letter because the judge expressly based his ruling on our opinion in Tome, as he had with Cambron's prior statement. (XIII R. at 565.) There is no argument to the contrary by the government. Thus we feel that the statement in issue was made when the declarant had a motive to falsify. It follows that the admission of the statement was error under the new rule of Tome.[2]

---

[2]The government argues, however, that the Marino statement was admissible in any event because under the court's limiting instruction to consider the letter only as it pertained to Marino's credibility, the letter was not hearsay at all. We disagree. This argument would severely undercut the holding of Tome by allowing otherwise inadmissible evidence to be heard under a limiting instruction. We think this would be inconsistent with much of the reasoning of Tome.

The Court there reviewed the prevailing common law before the adoption of the Federal Rules of Evidence. The Court noted that it was well established that the common law permitted prior inconsistent statements to rebut a charge of recent fabrication only if the prior statement had been made before a motive to falsify had arisen *and* permitted the statement to be received only for the limited purpose of supporting the witness's credibility, not for the truth of the matter asserted in the prior statement. Tome, 115 S.Ct. at 700-01. Fed. R. Evid. 801(d)(1)(B) dropped the limitation on the use of the evidence but, the Court held, did not alter the pre-motive requirement.

The government now suggests that the rule, *sub silentio*, also modified the common law rule by incorporating an exchange whereby the proponent of the evidence could forego the advantage of the rule's unrestricted use of the prior statement and in return be relieved of the pre-motive requirement. It is sufficient to say that nothing at all in the language of the rule or the accompanying commentary provides support for the contention that the common

31

Accordingly, we must determine whether the erroneous admission of the parts of the evidence discussed above was harmless. With respect to the statement of Cambron to Officer Clark, we note that defense counsel mounted a vigorous cross-examination of Cambron, effectively attacking his credibility. Defense counsel ably developed the factual context showing that Cambron could have been motivated by his hope of receiving leniency when he made these statements to Officer Clark. The jury simply chose to believe that Cambron was testifying truthfully, despite defense counsel's efforts to show why the jurors should not believe Cambron's testimony. We think that the statement to Officer Clark played an insignificant role in that assessment.

With respect to the Marino letter and the threat which defendant suggests was made, we likewise feel that the admission of the evidence was harmless error. Evidence of a threat certainly can have a substantial impact. As to the Marino letter, however, the disputed evidence merely repeated previous testimony that a threat had been made. An erroneous repetition of such evidence clearly must be expected to have less influence on the jury than an error which injects something like this into the trial when it otherwise would have remained unknown to the jury. Considering that the prior statement by Marino in the letter is only one sentence out of a lengthy trial, and in view of the overall case against defendant Albers, we feel this error was harmless.

In sum, the two evidentiary matters which were admitted in violation of the

---

law rule has been so substantially amended by Fed. R. Evid. 801(d)(1)(B).

32

pre-motive rule and <u>Tome</u>, we hold to have been harmless error.

## IV

## THE CLAIM OF ERROR IN THE COURT'S QUESTIONING OF A GOVERNMENT WITNESS

We next consider defendant's contention that the district court created an appearance of partiality by its questioning of one of the government's witnesses. We review the propriety of a judge's examination of a witness for abuse of discretion. <u>United States v. Latimer</u>, 548 F.2d 311, 314 (10th Cir. 1977).

The witness in question is Donald Guthrie, who was the manager of Agri-Data's Belle Plain facility, where the barrels of ephedrine were delivered. Direct, cross, re-direct, and re-cross examination of Guthrie had been completed before the judge began asking questions. In his direct examination Guthrie had testified, among other things, that defendant had called him twice at Agri-Data's Belle Plain warehouse from Agri-Data's Wichita office regarding the shipment of ephedrine in May. Guthrie testified that defendant had called him once to tell him that he was expecting a delivery of chemicals from a delivery service and wished to be notified when the chemicals arrived. Guthrie said that the second call came on the day of the delivery when defendant called to tell Guthrie that the delivery service had confirmed that the shipment had come in and would be delivered to Belle Plain later that day. (XIII R. at 401-02.) The witness said that it was unusual for Mr. Albers to have done this.

After receipt of the barrels of ephedrine Guthrie said he asked defendant on several occasions what the material would be used for and that he first received non-committal

33

responses, until finally defendant told him that the chemical was to be used on crops. (Id. at 404-05.) Guthrie was later interviewed by DEA agents at the Belle Plain facility and testified about that discussion, which culminated in the execution of a search warrant and the seizure of the barrels in which the ephedrine had originally been shipped. Guthrie testified that the following day he showed a copy of the search warrant to defendant, and Guthrie described defendant's reaction. Guthrie said that defendant began pacing the floor and acted "jittery." (Id. at 408.) He went on to say that defendant responded to the fact that the DEA agents had seized the barrels by chuckling to himself and saying, "Well, they're not going to find anything in 'em." (Id. at 408-09.)

After some general questions about the processes involved in creating special fertilizer blends, Guthrie was asked: "Did you ever know of any blend that was done at Agri-Data that contained ephedrine?" He replied that he did not. (Id. at 414.) On cross-examination Guthrie admitted that he had testified in "previous proceedings related to this case" (*i.e.*, the first trial) and had been interviewed by government investigators without ever mentioning that defendant had chuckled when he said that the DEA agents would not find anything in the barrels. (Id. at 445-46.) On re-direct examination, the prosecutor asked if Guthrie had been asked previously whether defendant chuckled, and Guthrie said he had not been asked. The prosecutor then asked: "Did he chuckle?" Guthrie repeated that defendant had chuckled, acted jittery, and paced around. (Id. at 449-50.) These were the only questions asked on re-direct (except a preliminary question as to whether Guthrie had reviewed his

prior testimony and a brief repetition of whether Guthrie had been asked the question before, after Guthrie asked for clarification of the question). On re-cross examination defense counsel asked one question: whether anyone had asked Guthrie about chuckling in this trial when he volunteered that in his direct testimony, to which Guthrie said that he had not been asked that. (Id. at 450.)

Defense counsel then announced that he had no more questions, and the judge immediately asked: "Are you making this up, that he chuckled and was nervous?" (Id.) Guthrie said he was not. (Id.) The court then went on to ask a series of questions. This covers almost nine pages of the transcript.[3]

We have carefully reviewed this questioning by the judge and conclude that he did not abuse his discretion. The trial judge's authority to question witnesses is, of course, beyond dispute. Fed. R. Evid. 614(b). It is equally clear, however, that in exercising this power a judge must take care not to create the appearance that he or she is less than totally impartial. In arguing that the court's interrogation of Guthrie exceeded proper bounds, created an appearance of partiality, and so constituted an abuse of discretion, defendant invokes our observation that "[i]nterrogation of witnesses by a judge in a criminal case creates a unique risk that the judge will be perceived as an advocate." United States v. Orr, 68 F.3d 1247, 1250 (10th Cir. 1995), cert. denied, 116 S.Ct. 747 (1996).

In contending that the trial judge's actions were within the bounds of propriety, the

---

[3]The questioning by the trial judge is reproduced as an appendix to this opinion.

government notes these related comments by this court:

> "It cannot be too often repeated, or too strongly emphasized, that the function of a federal trial judge is not that of an umpire or of a moderator at a town meeting. He or she sits to see that justice is done in the cases . . . and to see that a case on trial is presented in such way as to be understood by the jury . . . . [A federal trial judge] should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other."

United States v. Jones, 730 F.2d 593, 598 (10th Cir. 1984) (quoting Simon v. United States, 123 F.2d 80, 83 (4th Cir.), cert.denied, 314 U.S. 694 (1941)). As the Advisory Committee noted in proposing Rule 614:

> The authority of the judge to question witnesses is also well established. The authority is, of course, abused when the judge abandons his proper role and assumes that of advocate, but the manner in which interrogation should be conducted and the proper extent of its exercise are not susceptible of formulation in a rule. The omission in no sense precludes courts of review from continuing to reverse for abuse.

Advisory Committee Notes on Rule 614(b), 28 U.S.C.App., p. 886 (citations omitted). We have noted the propriety of questioning by the court to clarify testimony but have consistently warned that the judge must not become an advocate for either side. E.g., Orr, 68 F.3d at 1250; United States v. Latimer, 548 F.2d at 314.

We have considered the judge's interrogation complained of in light of the principles of our precedents. We cannot agree that the judge by his questioning abused his discretion or committed error by his questioning that impaired defendant's right to a fair trial.

**V**

**CONSIDERATION OF THE CUMULATIVE EFFECT**

36

**OF THE TRIAL ERRORS**

Defendant also argues that even if the errors taken individually were harmless, nevertheless he was denied a fair trial by their cumulative effect. Because we have found that errors did occur at trial, we agree that we must carefully consider this contention of cumulative error. Our method of analysis is as follows:

> A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Unless an aggregate harmlessness determination can be made, collective error will mandate reversal, just as surely as will individual error that cannot be considered harmless. The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error -- courts look to see whether the defendant's substantial rights were affected.

United States v. Rivera, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc).[4]

We carefully considered the errors we have treated in Parts II and III and there held them harmless under Kotteakos. We conclude likewise that the effect of the errors in aggregation was slight, if any, and therefore was harmless for reasons we discussed in detail in Parts II and III.

**VI**

**THE CHALLENGE TO THE FOUR LEVEL ENHANCEMENT
OF THE OFFENSE LEVEL**

---

[4]This standard of course applies to non-constitutional errors. If any of the errors were constitutional, the stricter standard of harmless beyond a reasonable doubt would apply. Rivera, 900 F.2d at 1470 n. 6 (citing Chapman v. California, 386 U.S. 18 (1967)).

Finally, defendant contests the life sentence imposed, claiming error in the district court's enhancement in his offense level as a leader or organizer of criminal activity involving at least five people under § 3B1.1 of the Sentencing Guidelines ("USSG"). The enhancement under this provision resulted in a four level increase in Albers' offense level and that in turn led to a life sentence. On appeal defendant challenges only the finding or conclusion that he was an organizer or leader; he concedes that the activity involved more than five persons.

In appeals involving the Sentencing Guidelines, we review the district court's factual findings only for clear error, giving "due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e); United States v. Torres, 53 F.3d 1129, 1142 (10th Cir.), cert. denied, 115 S.Ct. 2599 (1995). "However, a challenge to the conclusion reached that one is a supervisor as defined in the Guidelines is primarily legal, and the trial court's determination on it is reviewed under a *de novo* standard." United States v. Brown, 995 F.2d 1493, 1501 (10th Cir.), cert. denied, 114 S.Ct. 353 (1993). See generally United States v. Roberts, 898 F.2d 1465, 1468-69 (10th Cir. 1990) (standard of review under Guidelines depends on relationship of the facts to the guidelines standard being applied and, like our circuit's previous standard for reviewing mixed questions of fact and law, varies from clearly erroneous to *de novo* depending on whether the inquiry is primarily factual or primarily involves consideration of legal principles). The severity of this enhancement, we have noted, "deserves an appropriate level of scrutiny . . . to insure it is warranted in a

particular case." Torres, 53 F.3d at 1143 n.14.

Here we are convinced that we face a record which clearly lacks evidence to support a finding or conclusion that defendant Albers was a leader or organizer of the criminal activity under the test that applies, the government bearing the burden of proof. United States v. Owens, 70 F.2d 1118, 1129 (10th Cir. 1995). We feel this calls for a *de novo* review of the trial judge's primarily legal conclusion that defendant Albers was a leader or organizer of the venture. United States v. Brown, 995 F.2d at 1501. In any event, if the determination should be reviewed as a fact finding under the clearly erroneous standard, the finding was clear error on this record. See United States v. Owens, 70 F.3d 1118, 1129 (10th Cir. 1995).

The Guidelines provision applicable to this enhancement states, in pertinent part:

> Based on the defendant's role in the offense, increase the offense level as follows:
> (a)  If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
> (b)  If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.

USSG § 3B1.1 (1994). Commentary to this provision supplies some guidance to its intended use:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority

39

exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

USSG § 3B1.1, comment. (n. 3) (1994).

The government bears the burden of proof as to any findings necessary to support a sentence enhancement. Torres, 53 F.3d at 1142. Here, the government presented no new evidence at the sentencing hearing, relying on the trial evidence, as it may. The district judge granted the enhancement, stating:

> Now, I heard the evidence in this case and there's no question in my mind, and I so find, that Mr. Albers was a leader or organizer in this criminal scheme. As [prosecuting attorney] Mr. Watson has correctly pointed out, probably the two most culpable individuals were Mr. Cambron and Mr. Albers. But assuming the truth of the testimony, that Mr. Cambron initiated the idea of making the methamphetamine, it was Mr. Albers who provided the means by which the methamphetamine was to be made. Without Mr. Albers' access to the L-ephedrine[,] which was a material that you can't go out to the local feed store or hardware store and buy, this methamphetamine could not have been manufactured, and it's absolutely clear from the evidence that it was the essential ingredient in the manufacture of the methamphetamine. So there's just simply no question in terms of the facts, Mr. Wilson [addressing defendant's new counsel], that Mr. Albers was a leader in this and that this -- and that there were more than five people involved in the scheme and, therefore, I find that this enhancement was appropriate and that the Government has not only proved it by a preponderance of the evidence which is the Government's burden, but by beyond a reasonable doubt because this was evidence that was brought out in the trial and which the jury accepted under the beyond a reasonable doubt standard, so there's simply no question about that. So the first objection is overruled.

(XV R. at 19-20.)[5]

Much of the evidence the government now cites to support the enhancement, like the findings of the judge, suggests that defendant played an important or essential role in the scheme. This is insufficient because, as our precedents instruct, the sentencing court should remain conscious that "the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals," and the enhancement is "not for important or essential figures." Torres, 53 F.3d at 1142 (emphasis added) (quoting United States v. Roberts, 14 F.3d 502, 519 (10th Cir. 1993)); and see United States v. Litchfield, 959 F.2d 1514, 1523 (10th Cir. 1992). The government contends that defendant attempted to control Cambron during the meeting in California over the Labor Day weekend, when everyone else present at the meeting, according to Cambron, was urging him to begin using some caution because of his two arrests and erratic behavior. (XII R. at 157-58.) This did not amount to supervising Cambron in the conspiracy to manufacture and distribute methamphetamine. The government also argues that defendant made decisions, such as the decision to use the cover story that the ephedrine would be used in an experimental fertilizer program. However the evidence is insufficient to show whether this idea originated with defendant Albers, with Cambron, or with Stuber, and which of them made the decision, or whether it was made

_____

[5]The court's reference to the jury's verdict is unpersuasive on the enhancement issue. The jury decided such issues as whether defendant was a knowing participant in the conspiracy, not whether he committed any of the particular kinds of acts which may support the enhancement for having been a leader or organizer of the criminal venture.

jointly. (XII R. at 95-96.)

We are convinced that the evidence clearly established that Cambron was the leader of this conspiracy. As the judge noted, the evidence was that Cambron initiated the idea of manufacturing methamphetamine, having learned about the ephedrine ingredient from Larry Rosson while in jail, Rosson suggesting that Cambron call Marino. (XII R. 193-95.) Government witness Cambron also admitted it was all his idea to approach defendant Albers in Houston about ephedrine. (XII R. 207.) Before going to Wichita, Cambron knew the price of a drum of ephedrine and how many pounds were in a drum. (Id. at 202.) Cambron acquired a manual of chemical companies and did the calling to inquire about the availability of ephedrine. (Id. at 105.) Cambron recruited Marino, and other key participants were either recruited by Cambron or by Marino. (Id. at 87-88, 195; XIII R. at 497-503, 582-85; III Supp. R. at 5.) Various parts of the methamphetamine operation were carried out in California after the ephedrine arrived there from Wichita by several defendants other than Albers -- Cambron, Marino, Marino's wife Janet Raisner, Francis, and Vergilio. Jack Francis was manufacturing methamphetamine for the group. (XII R. 126-133, 141.)

It is true that there can be more than one leader, as the Guidelines commentary states. Here, however, the evidence is clear that Cambron was the primary figure and that while Albers played a critical role in obtaining ephedrine, he did not supervise others nor organize the activities. We have vacated enhancements under this Guidelines provision despite stronger evidence than is present here. In United States v. Owens, 70 F.3d at 1127-29, the

42

defendant supplied cocaine to his nephews on credit, derived profits from the trafficking, helped to teach others to cook cocaine powder into crack cocaine, counseled one of the dealers on how to "take care of" a customer who had complained of the quality of the product, and personally delivered cocaine at times. Nevertheless we held that: "[a]t most, this evidence shows Nick Owens was deeply involved in the conspiracy, first as a supplier and later as a courier; it does not show he led or organized the conspiracy." Id. at 1129. We concluded that the finding that Nick Owens was a leader or organizer was clearly erroneous. Id.

In United States v. Roberts, 14 F.3d 502 (10th Cir. 1993), the district court had made a three level enhancement of the offense level of Jackie Wood, who was the fiancee of the alleged ringleader. The three level enhancement under § 3B1.1(b), quoted above, applies to one who is a manager or supervisor, but not an organizer or leader. The district court had found that Wood had a long relationship with Roberts, the alleged ringleader, and described her role as "distributing, delivering, assisting in making arrangements for methamphetamine," and also found she had "acted as a source of methamphetamine to promote this activity in Casper, Wyoming." 14 F.3d at 523. We held that these findings were not clearly erroneous but did "not constitute evidence of *decision-making* authority or control over a subordinate necessary to conclude Ms. Wood was a supervisor or manager." Id. (emphasis in original). See also Litchfield, 959 F.2d at 1523. We held that the enhancement was without record support and vacated that portion of the sentence. Similarly,

43

in this case the finding that Albers was an essential figure is not clearly erroneous, but as a matter of law it is insufficient to support the enhancement.

The government also contends that Albers claimed a right to a larger share of the profits than others. There is evidence that he did profit from the venture, but the division of the profits among the others was not shown. The government says defendant Albers received at least $89,000, and cites Marino's testimony denying he was paid money from the proceeds and saying he was paid for Cambron's living at his house. (Brief of Appellee at 44; XIII R. at 537.) But the pot was much larger, government witness Cambron testifying he sold approximately $800,000 worth of methamphetamine produced from the amount of ephedrine shipped to Marino (XII R. 212), and the shares in the large profits actually received or claimed by the participants other than defendant Albers were not shown.[6] Thus the record as to this factor of a claim of a larger share of profits was unclear. In his statement on the

---

[6]The evidence summarized in Part I indicates Albers received about $77,000 in proceeds after the methamphetamine was manufactured from the ephedrine. He also got $10,000 for the cost of the second unsuccessful order of ephedrine. Cambron testified another $20,000 had been sent to defendant Albers when the second order for ephedrine was being planned, but that defendant Albers said later he lost this money in the stock market. Even if these sums are added to the $77,000 figure so as to make a total of payments of $107,000, there is doubt as to what part was proceeds paid to Albers and what was for the cost of payments for ephedrine. Most significantly, the absence of evidence on the division of the some $700,000 of the remainder of the $800,000 of proceeds from methamphetamine sales by Cambron prevents any conclusion as to whether defendant Albers claimed or received a larger share than the other participants in the unlawful venture. See United States v. Owens, 70 F.3d at 1129 (evidence that profits were split equally does not support enhancement under this provision).

enhancement, quoted above, the trial judge made no finding or mention of any claim of a larger share of profits by defendant Albers. We must reject this as a theory to support the enhancement.

We are convinced that the four-level enhancement for defendant's role in the offense was error and that this portion of the sentence must be vacated. We do not set aside the separate enhancement related to perjured testimony which was not appealed.

Accordingly the convictions are **AFFIRMED**, the sentence is **VACATED**, and the case is **REMANDED** for resentencing in accordance with this opinion.

# APPENDIX

**The interrogation by the district judge which is challenged on appeal by defendant Albers was as follows:**

THE COURT: I have just a couple of questions. Are you making this up, that he chuckled and was nervous?

A: No, sir, no.

THE COURT: Now, I may have gotten my dates wrong, Mr. Guthrie. You worked at the Belle Plain facility until I think you said March of 199 --

A: Two.

THE COURT: Two.

A: Yes, sir.

THE COURT: Okay. And you started to work there, when was it?

A: November of '89.

THE COURT: Okay. Now, was Mr. Albers involved with Agri-Data during that entire period?

A: Yes, sir.

THE COURT: Okay. And this incident involving the barrels, that is when the barrels were delivered, occurred, when was that, Counsel? What day were the barrels delivered, Mr. Monnat?

MR. MONNAT: May 15th of 1991.

THE COURT: May 15th. From the time you began working at Agri-Data in November of 1989 until this incident of May 1991, how many other instances, if any, can you recall where Mr. Albers called you one or more times with respect to deliveries of things to the plant?

A: Chemicals? As to chemicals or of anything?

THE COURT: Well, as to chemicals.

A: As to chemicals, this is -- like I was statin' earlier, there was one previous time that we did have some chemicals delivered to the plant, and like I stated before, I don't recall who it was delivered from and what brand or what type of chemical it was. Then this particular situation. Then as far as 2,4-D, Clayton could have called me, I just don't recall, as to that customer that was wanting this particular 2,4-D. I don't recall if it was the customer himself or Clayton or Scott or whoever that called me to pick up this 2,4-D for the customer and deliver it directly out to the fields to be used.

THE COURT: All right. Now, I'm unclear, after the ephedrine was delivered on May 15, 1991, I am unclear when you asked the Defendant, you say four or five times, what the ephedrine was -- or the chemical was?

A: Was going to be used for.

THE COURT: Was going to be used for?

A: It was over a course of weeks or a month or so. I honestly couldn't tell you, Your Honor,

as to the specific time or date or anything like this.  It was just over a course of a period of time.  Just, for example, there was another individual that was involved with Agri-Data, that was Mark Thomas, and even Mark Thomas questioned --

MR. MONNAT:  I object to any hearsay from Mark Thomas.  This is probably unresponsive.

THE COURT:  Why don't you just tell me about what Mr. Albers was saying and what you were saying to him.

A:  Like I said, it was over a course of several weeks or months, I honestly -- like I was saying before, I couldn't give you specific days or times, but there was several times where I asked Clayton what was the purpose of the chemical or what we was gonna use it for.  And like I stated before is that on one occasion Clayton just raised his shoulders like that, and that was the only answer I recall getting out of him on one particular situation.  And another time he answered directly back, said I don't know.  And it wasn't -- like I stated before, it was not until the last time I asked him about it he said we was gonna use it on crops, and I just left it at that.  I didn't raise a question about the chemicals any more.

THE COURT:  Was it -- I take it that during the period of time from 1989 to 1991 you had previous conversations with Mr. Albers concerning things at the facility and operation of the plant?

A: Yes, sir.  Matter of fact, if there was a chain of command, if you don't mind me using that term, Clayton was my -- I looked at Clayton as my main boss.  I went to Clayton the majority of the time before I went to Scott.  I asked Clayton majority of the time for his opinion instead of Scott Stuber's.

THE COURT:  In the previous times that you had asked Mr. Albers for his opinion had he given you his opinion directly or had he shrugged his shoulders and not been -- not responded to you directly?

MR. MONNAT:  Your Honor, may we approach, please.

THE COURT:  No, you may not.

MR. MONNAT:  I object to the question.

THE COURT:  You may object and you may sit down, sir.

A:  As to as to the previous times before these situations?

THE COURT:  Yes.

A:  As to if Clayton didn't give me a straight answer, I don't recall.  Usually Clayton and I, we had a pretty good working relationship.  He was pretty much open and honest with me.  And it was vice versa as far as that goes.  There was only one situation where him and I, we had a disagreement, and that had to do with the firing of an employee.

THE COURT:  All right.  Now, when he did tell you what this was to be used for, which I take it was -- and I'm not trying to put words in your mouth.  You tell me.

A:  Yes, sir.

THE COURT:  A month or so.  Are you saying after you had -- after the

2

ephedrine had been delivered and you first inquired about it or --

A: The very first time?

THE COURT: Right. I'm trying --

A: As to when I asked Clayton what the chemicals were for?

THE COURT: Right.

A: I'll be honest with you, I couldn't give you a straight answer on that, Your Honor. I don't know if it was that week or the week following or it could have been a month later. I honestly couldn't tell you. I couldn't give you -- I just remember specifically asking Clayton several times as to what was the purpose of this chemical.

THE COURT: Well, my -- I think my main area of concern is whether you have a recollection of it being like you asked him three or four times in a two day period or whether it was over a longer period?

A: It was over a longer period.

THE COURT: And it was at the last -- the last time you asked him that he told you what?

A: That it was going to be used on crops.

THE COURT: Did he indicate anything else to you at that time?

A: No, sir.

THE COURT: Did he --

A: None whatsoever.

THE COURT: -- indicate anything about what kind of crops?

A: No, sir.

THE COURT: Where?

A: No, sir.

THE COURT: Why it was going to be used on crops?

A: No, sir.

MR. MONNAT: Your Honor, I apologize, but I have to object to the Court's question and I'd request to approach the bench.

THE COURT: Please sit down, Mr. Monnat. Your objection is noted.

Nothing other than it was just going to be used on crops?

A: That is correct, Your Honor.

THE COURT: Now, I'm unclear, at some point in time, we've had, what is it, Exhibit 10 --

A: The field maps here.

THE COURT: Right.

A: Yes, sir.

THE COURT: I don't understand how that gets tied into this.

A: Okay. If you don't mind a long lengthy discussion as --

THE COURT: Please don't make it long and lengthy.

3

A: Okay.

THE COURT: Did you prepare that?

A: No, sir. It was not prepared by me personally.

THE COURT: Well, what is it? What is it exactly?

A: Okay. When a customer gives our company a call that he requests a soil test or a tissue test on a specific field, the employees we send out to do the soil test, they would draw these maps up --

THE COURT: Okay.

A: -- personally themselves and then they would bring them back to this office. That way we got records exactly where the field location is and what field we are referring to for application.

THE COURT: All right. And does that document reflect when something was put on the field?

A: The only thing as far as a date, it just gives a year. It does not give no specific month or date.

THE COURT: Does it indicate who prepared it?

A: As far as an employee's name, sir, no, sir. And it's been too long where I could not recognize the writing. And we, majority of the time, as far as on the field maps, either it was done by John Ottley, Steve Ash, then on occasions we did have our hired hands do it themselves. So it could be a number of people involved in that.

THE COURT: Do you as the manager of the plant have any independent knowledge, apart from Exhibit 10, that something supposedly or allegedly or in fact containing ephedrine --

A: Was put on the field?

THE COURT: -- was ever put on a field?

A: No, sir, not to my knowledge whatsoever until this situation came up.

THE COURT: Just a couple of final questions. After the search warrant was served, which would have been when?

A: What was the date? October --

THE COURT: Sometime in October of 1991.

A: Yes, sir.

THE COURT: You went this to see Mr. Albers the following day about the search warrant?

A: Yes, sir. First thing in the morning.

THE COURT: And it was at that time that he told you that he had come to the plant at 2 a.m. alone. Is that correct, alone?

A: Yes, sir.

THE COURT: And had mixed the ephedrine with potash?

A: Yes, sir. He did not give me no specific day or time or month.

4

THE COURT:  That was where I was confused.

A:  No, sir.

THE COURT:  Did he indicate when he had done that at all?

A:  No, sir.

THE COURT:  Did I understand you to say when Mr. Monnat was questioning you that there were times when deliveries would be made, what, after hours?

A:  Well, to be honest with you, Your Honor, there was no such hours at the plant, because when you're in agriculture you work as when the crop is needed.

THE COURT:  I'm sure that's true.

A:  So there was no specific set time.  Like Mr. Monnat said, it was not definitely 8 to 5 or anything like that.

THE COURT:  I understand that.  But I'm just asking you, did Mr. Albers indicate in any way to you that he was at the plant to accept a delivery or give you any other explanation other than he was there alone at 2 a.m. and mixed these chemicals, products?

A:  That is correct.

THE COURT:  Nothing else was said --

A:  Nothing else.

THE COURT:  about why he was there?

A:  No, sir.

THE COURT:  -- about why he was there?

A:  No, sir.

THE COURT:  And one final question.  When you went out with the DEA to take these samples, when was that?

A:  I don't know if I wrote a date down here or not without looking. I'm sorry.  I honestly couldn't tell you, Your Honor, as to --

THE COURT:  Was it in the fall of 1991?

A:  There is a date back here, but I don't know if the date that is back here has to do with the time when we went out to the fields, Your Honor.

THE COURT:  All right.  I'm trying to figure out, you didn't -- you worked there until March of 1992, so it must have been sometime in the fall of 1991?

A:  That is correct.  Yes, sir.  Like I stated earlier, it was early fall because the fields were being prepared for that year's crop.

THE COURT:  I see.  Okay.  Thank you very much, sir.  Do you have any questions in light of mine?

MR. WATSON:  I do, just a couple, as to 10.

5