**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 7, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.                                                                    No. 17-2028

JESSIE JESUS MARQUEZ,

    Defendant - Appellant.

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:13-CR-03367-RB-2)**
_____

James L. Hankins, Edmond, Oklahoma, for Defendant-Appellant.

Sarah M. Davenport, Assistant United States Attorney (James D. Tierney, Acting United States Attorney, with her on the brief), Las Cruces, New Mexico, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, Chief Judge, **MORITZ** and **EID**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.
_____

Jessie Marquez appeals his convictions for six drug-related crimes, including conspiracy to distribute 500 grams of methamphetamine. Marquez raises three issues: he challenges the sufficiency of the evidence supporting each of his convictions, he asserts that the district court erred by questioning a witness, and he contends that the

district court shouldn't have admitted certain testimony from two of the government's witnesses. We reject each of Marquez' arguments. First, we conclude that the evidence was sufficient for a rational jury to find Marquez guilty of using a phone to facilitate a drug felony, participating in a conspiracy to distribute over 500 grams of methamphetamine, and possessing methamphetamine with the intent to distribute it. Next, we hold that the district court didn't err when it asked a witness one question to clarify a factual matter. Last, we find that the district court didn't abuse its discretion or plainly err when it admitted testimony from government witnesses. Accordingly, we affirm.

## Background

In January 2013, law enforcement began investigating Robert Christner's methamphetamine dealings in and around Alamogordo, New Mexico. Investigators conducted several controlled drug purchases from Christner and began attempting to identify his suppliers and distributors. They also surveilled and interrupted two drug deals—one in March 2013 and one in June 2013—in which Christner attempted to buy several pounds of methamphetamine from suppliers in Arizona.

During the course of this investigation, investigators obtained wiretaps on Christner's phones, allowing them to intercept many of his calls and text messages. Then, when Christner set up meetings over the phone, investigators sometimes surveilled those meetings. In one such instance, they identified Marquez as someone who had spoken to Christner on the phone about obtaining methamphetamine and had arranged to meet up with him. And after identifying Marquez, they obtained a

2

wiretap for his phone as well. Highly summarized, the intercepted calls between Christner and Marquez suggested that (1) Marquez distributed methamphetamine that he obtained from Christner and (2) when Christner's methamphetamine supplier fell through, Marquez tried to find him a new supplier.

The investigation as a whole resulted in an indictment charging Marquez and 17 other individuals with conspiracy to distribute "500 grams and more" of methamphetamine.[1] R. vol. 1, 2. The indictment further charged Marquez with two counts of possessing methamphetamine with the intent to distribute and four counts of using a phone to facilitate a drug felony.

Marquez proceeded to trial, and the jury convicted him of conspiracy, all four phone counts, and one possession-with-intent count. The district court sentenced him to 121 months in prison. Marquez appeals.

## Analysis

### I.      Sufficiency of the Evidence

Marquez first challenges the sufficiency of the evidence supporting each of his six convictions. We review sufficiency questions de novo and look at "the evidence in the light most favorable to the government to determine whether any rational jury could have found guilt beyond a reasonable doubt." *United States v. Dahda*, 853 F.3d 1101, 1106 (10th Cir. 2017), *aff'd on other grounds*, 138 S. Ct. 1491 (2018).

---

[1] Christner himself wasn't charged because he died of complications from heart surgery a few months before the government filed the indictment.

## A. Using a Phone to Facilitate a Drug Felony

Marquez first maintains that the evidence wasn't sufficient to support his convictions for using a phone to facilitate a drug felony because the government didn't "produce *any* witness who claimed to be familiar with Marquez'[] voice in real life and who could then identify it . . . as the voice on the calls." Aplt. Br. 27. As a result, Marquez asserts, a rational jury could not have concluded that the voice on the intercepted calls was his. But as the record demonstrates, the government presented substantial circumstantial evidence of Marquez' identity.

DEA Case Agent Amy Billhymer and DEA Agent Conan Becknell testified about how they identified Marquez. Specifically, on April 19, 2013, investigators intercepted a call from Christner to a phone number designated as "Target Telephone 7." R. vol. 3, 129. In the call, Christner arranged to meet with an individual and accompany that individual to buy four ounces of methamphetamine for $3,200. Christner told this individual that he'd "be on foot," Supp. R. 89, and that the individual should pick him up so they could then go buy the drugs. Christner then made a second intercepted call, in which he arranged to meet Stephen Morales at a Pic Quick convenience store. Christner indicated to Morales that he wanted to pick up money from Morales for the drug purchase he planned to make with the individual on the first call. At the end of the call with Morales, Christner said, "[T]here's my ride." *Id.* at 91. He asked Morales to go to the Pic Quick "right now." *Id.*

At this time, Becknell was surveilling Christner, who was standing on a street corner. Becknell watched as a gold Mitsubishi pulled up and Christner got into the

4

passenger side of the vehicle. Becknell then followed the Mitsubishi as it drove to a Pic Quick and parked. Becknell followed Christner and the Mitsubishi's driver into the Pic Quick, at one point passing "within a couple of feet" of the two men. R. vol. 3, 212. Becknell then watched Christner leave the Pic Quick, get into a green car for a few minutes, and then get back into the Mitsubishi.

Later that day, Billhymer learned that Rose Marquez owned the Mitsubishi and that Jessie Marquez was her son. Billhymer showed Jessie Marquez' driver's license picture to Becknell, and Becknell identified him as the driver of the Mitsubishi. Becknell also identified Marquez in court as the driver.

The government presented additional evidence corroborating that it was Marquez' voice the agents intercepted on Target Telephone 7. First, in another call to Target Telephone 7, the speaker who answered the phone said he was "at [his] house in town. Over here on Hoagland." Supp. R. 78. Investigators discovered that Marquez had two residences, one of which had an address on Hoagland. Second, in another call to Target Telephone 7, the speaker who answered the phone mentioned that he worked at or near a Chuck E. Cheese at the mall, and investigators confirmed that Marquez worked there. Third, and perhaps most critically, in a call made by Target Telephone 7, the caller identified himself as "Jessie"—Marquez' first name. *Id.* at 134.

Marquez points out that Billhymer testified she'd never actually heard Marquez speak in person. Nor did the government present a witness familiar with Marquez' voice to testify that Marquez was speaking on the Target Telephone 7 calls.

5

But as we have outlined, the government presented strong circumstantial evidence that Marquez was the speaker on Target Telephone 7. And Marquez presents no other challenge to the sufficiency of the evidence for these counts. Thus, viewed in the light most favorable to the government, the evidence was sufficient for a rational jury to conclude that Marquez, speaking on Target Telephone 7, used a phone to facilitate a drug felony. *See Dahda*, 853 F.3d at 1106.

## B. Conspiracy

Marquez also challenges the sufficiency of the evidence supporting his conspiracy conviction. To convict Marquez on this count, the government had to prove that (1) "two or more persons agreed to violate the law," (2) Marquez "knew the essential objectives of the conspiracy," (3) Marquez "knowingly and voluntarily participated in the conspiracy," and (4) "the alleged co[]conspirators were interdependent." *Id.* at 1107. Additionally, to establish the scope of the charged conspiracy, the government had to prove that it involved "500 grams and more" of methamphetamine. R. vol. 1, 2. Marquez challenges all but the first of these elements, and his overarching argument is that the government failed to prove that he participated in a broad, 18-person conspiracy involving over 500 grams of methamphetamine.

First, Marquez points out that the evidence showed he interacted only with Christner and not with any of the other 17 people charged in this conspiracy. He argues that his separation from the rest of the group means that he didn't "kn[o]w the essential objectives of the conspiracy." *Dahda*, 853 F.3d at 1107. But being separate

6

from the remainder of the conspiracy isn't determinative: "A conspirator 'need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy.'" *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992) (quoting *United States v. Metro. Enters., Inc.*, 728 F.2d 444, 451 (10th Cir. 1984)). Instead, a conspirator must simply be generally aware of the conspiracy's scope and objective. *Id.* at 670.

Here, contrary to Marquez' argument, the government's evidence showed that Marquez was generally aware of the full scope and objective of the conspiracy, which was to distribute over 500 grams of methamphetamine. True, the evidence showed that Marquez himself distributed methamphetamine from Christner only in ounce quantities, not in pounds. But several of the intercepted phone calls showed that Marquez helped Christner locate a new methamphetamine supplier—one who was willing to sell Christner two pounds of methamphetamine per week. Specifically, Marquez reported to Christner, "I got us two a week. We're talking the p's at least, not three, but I got us two." Supp. R. 76. Law-enforcement officers testified that "p's" means "pounds," R. vol. 3, 332, that this conversation was about pounds of methamphetamine, and that there are "about 454 grams in a pound," *id.* at 322. So when Marquez reported that he "got [them]" two pounds of methamphetamine per week, he was referring to an amount well over the 500 grams charged in the indictment.

From these facts, viewed in the light most favorable to the government, a reasonable jury could conclude both that (1) the essential objective of the conspiracy

7

was to distribute over 500 grams of methamphetamine and (2) Marquez knew as much. That the evidence didn't show Marquez interacting with other charged coconspirators isn't determinative: a conspiracy requires only "two or more" people, and the evidence showed Marquez conspired with Christner. *Dahda*, 853 F.3d at 1107.

This same evidence supports the conclusion that Marquez "knowingly and voluntarily participated" in this conspiracy. *Id.* He both helped Christner find a new supplier and distributed methamphetamine that Christner provided. In short, this evidence showed that Marquez played at least "a minor role in the conspiracy [sufficient] to make him a co[]conspirator." *United States v. Pickel*, 863 F.3d 1240, 1252 (10th Cir. 2017).

Marquez challenges the interdependence element as well, for which "the evidence must show the 'coconspirators intend[ed] to act together for their shared mutual benefit within the scope of the conspiracy charged.'" *Id.* (alteration in original) (quoting *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009)). To determine whether the government presented sufficient evidence of this element, we ask whether Marquez' actions "facilitated the endeavors of other alleged co[]conspirators or facilitated the venture as a whole." *Id.* at 1252–53 (quoting *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1124 (10th Cir. 2011)).

Contrary to Marquez' argument, the government presented sufficient evidence of interdependence. First, Marquez' assistance in finding Christner a new methamphetamine supplier was undoubtedly intended to facilitate the drug

8

conspiracy. *See id.* at 1253 ("[A] single act can be sufficient to demonstrate interdependence." (quoting *Caldwell*, 589 F.3d at 1329)); *Evans*, 970 F.2d at 671 ("What is needed is proof that [the conspirators] intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged."). The government bolstered this conclusion by presenting intercepted calls that Christner made to four of his other distributors immediately after learning that Marquez had reached a deal with the supplier for two pounds of methamphetamine a week. In these calls, Christner told his distributors that he obtained some "groceries," which investigators testified meant methamphetamine. Supp. R. 82. He also told his distributors that he would be getting more methamphetamine in the future: "I think I found uh, uh, somebody with those groceries all the time." *Id.* at 83. This was sufficient evidence from which the jury could conclude that Marquez' actions "were necessary or advantageous to the success of the activities of co[]conspirators," satisfying the interdependence element of conspiracy. *Pickel*, 863 F.3d at 1253 (quoting *United States v. Daily*, 921 F.2d 994, 1007 (10th Cir. 1990), *abrogated on other grounds by United States v. Gaudin*, 515 U.S. 506 (1995)).

Marquez also frames his sufficiency argument in a different light, insisting that a fatal variance occurred because the evidence at trial only proved that he participated in smaller, individual conspiracies and not the large, 500-gram conspiracy charged in the indictment. *See United States v. Carnagie*, 533 F.3d 1231, 1237 (10th Cir. 2008) ("A variance arises when an indictment charges a single conspiracy but the evidence presented at trial proves only the existence of multiple

9

conspiracies."). But as we have outlined, the government's evidence was sufficient for a jury to conclude that Marquez knew the conspiracy's essential objective and knowingly and voluntarily participated in it because he helped Christner find a supplier of two pounds, or 908 grams, of methamphetamine per week. That conclusion dooms Marquez' variance argument. *See United States v. Griffin*, 493 F.3d 856, 862 (7th Cir. 2007) ("We treat a conspiracy variance claim as an attack on the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy.").

Thus, we reject Marquez' contention that a variance occurred in this case. *See United States v. Fishman*, 645 F.3d 1175, 1191 (10th Cir. 2011) (finding no variance because "record amply support[ed] the jury's determination that there was only a single conspiracy"). And because we find no variance, "we do not reach the second question of whether [the] variance substantially prejudiced" Marquez. *United States v. Serrato*, 742 F.3d 461, 468 (10th Cir. 2014).

### C.    Possession with Intent to Distribute

Marquez next argues that the government's evidence was insufficient to prove that he possessed methamphetamine with the intent to distribute it. The indictment charged Marquez with possessing and intending to distribute methamphetamine "[o]n or about March 16, 2013." R. vol. 1, 18. The government's only evidence for this count was one intercepted phone call between Marquez and Christner on March 16. It introduced no other evidence to show that Marquez possessed drugs on that date.

10

In the call, Christner and Marquez didn't specifically use the words "drugs" or "methamphetamine." But government witnesses testified that they were discussing methamphetamine in coded language. Essentially, the two discussed Marquez' progress in distributing a prior batch of low-quality methamphetamine and a new batch of high-quality methamphetamine. Marquez told Christner—in reference to the low-quality batch—"I still have it." Supp. R. 25. Christner replied that if people were complaining about the low quality, Marquez should sell the new, higher-quality batch. Marquez told Christner that people weren't complaining. And about the high-quality batch, Marquez said, "I haven't even got to that yet." *Id.*

Marquez contends that this intercepted call wasn't sufficient to prove that he possessed methamphetamine on March 16. In support, he cites two cases from this Circuit, *United States v. Hall*, 473 F.3d 1295 (10th Cir. 2007), and *United States v. Baggett*, 890 F.2d 1095 (10th Cir. 1989); and one Second Circuit case, *United States v. Bryce*, 208 F.3d 346 (2d Cir. 1999). He then nakedly asserts, in an argument section spanning just over one page, that these authorities stand for the proposition that "phone calls indicating meth[amphetamine] possession, standing alone" are *never* sufficient to prove possession. Aplt. Br. 26.

As Marquez points out, in both *Hall* and *Baggett*, this court found intercepted phone calls to be insufficient, standing alone, to support possession convictions. *See Hall*, 473 F.3d at 1309; *Baggett*, 890 F.2d at 1096–97. But Marquez overstates the holdings of those cases, especially in light of critical factual distinctions. For instance, the phone calls in both *Hall* and *Baggett* involved individuals arranging to

11

*buy* drugs. *See Hall*, 473 F.3d at 1307; *Baggett*, 890 F.2d at 1096. Standing alone, those calls established only that the defendants attempted to purchase drugs, not that they ever actually possessed them. As a result, the calls weren't sufficient, on their own, to establish a possession crime. *See Hall*, 473 F.3d at 1309; *Baggett*, 890 F.2d at 1096–97. Here, the call didn't show Marquez arranging to *buy* methamphetamine from Christner—on the contrary, Marquez specifically discussed distributing the methamphetamine he already possessed.

The facts in *Bryce* are similarly distinguishable. In the phone calls at issue there, the defendant said that he "possess[ed] a large quantity of powder cocaine, maintained that he had sold or otherwise distributed several kilograms to others, and agreed to sell one kilogram . . . for $22,500." 208 F.3d at 353. The Second Circuit determined that the defendant's statements, standing alone, weren't sufficient to support a possession conviction because they "raise[d] questions as to whether or not [the defendant] actually possessed or distributed cocaine on the relevant dates." *Id.* at 356. Specifically, although the defendant appeared to agree to sell some drugs that he possessed, he then (1) became unavailable to the buyer, (2) backtracked on the amount he possessed, (3) only reluctantly agreed to make the sale, and (4) never met with the buyer as planned. *See id.* In light of such equivocal statements and behavior, the Second Circuit concluded that a rational jury could not have found beyond a reasonable doubt that the defendant possessed cocaine on the date alleged. *See id.*

In contrast, Marquez' statements here were unequivocal. He plainly told Christner that he possessed two batches of methamphetamine and that he had been

12

distributing only the low-quality batch. And here, unlike in *Bryce*, there was no evidence to undercut Marquez' straightforward assertion of possession.

In short, we reject Marquez' argument that *Hall*, *Baggett*, and *Bryce* stand for the proposition that phone calls are never sufficient, standing alone, to support a possession conviction. In each of those cases, the government presented only circumstantial evidence of possession, such as phone calls showing a plan to purchase drugs or containing unreliable statements of possession. From such circumstantial evidence, a jury could only determine possession by inferring that the drug purchase actually took place or that some other evidence corroborated the unreliable statement. Indeed, the *Baggett* court noted that "[i]f the prosecution is not going to present direct evidence of drug possession, its circumstantial evidence must include some testimony linking defendant to an observed substance that a jury can infer to be a narcotic." 890 F.2d at 1097.

But in this case, the government *did* present "direct evidence of drug possession." *Id.* "Direct evidence is evidence [that], if believed, resolves a matter in issue" without further inference. *United States v. Cardinas Garcia*, 596 F.3d 788, 796–97 (10th Cir. 2010) (quoting 16 McCormick on Evidence § 185 (6th ed. 2006)); *see also Evidence*, Black's Law Dictionary (10th ed. 2014) (defining "direct evidence" as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption"). If the jury believed Marquez' statements that he "still" had the low-quality methamphetamine and "ha[d]n't even got[ten] to" the high-quality methamphetamine, no further inference

13

was necessary to conclude that he possessed methamphetamine. Supp. R. 25; *see also United States v. Levario*, 877 F.2d 1483, 1485 (10th Cir. 1989) (describing defendant's statement about what he was transporting—"I didn't think it was that [cocaine], I thought it would be marijuana"—as "direct evidence" of drug possession (alteration in original)), *overruled on other grounds by Gozlon-Peretz v. United States*, 498 U.S. 395 (1991). Thus, Marquez' statements on the intercepted call, viewed in the light most favorable to the government, were sufficient for a jury to conclude beyond a reasonable doubt that on March 16, 2013, he possessed methamphetamine with intent to distribute.

## II.   District Court's Witness Examination

Marquez next asserts that the district court erred when it questioned Agent Billhymer in front of the jury. As Marquez acknowledges, he did not object to this questioning below, so we review for plain error. *See United States v. Ibarra-Diaz*, 805 F.3d 908, 916 (10th Cir. 2015). To obtain relief under the plain-error standard, Marquez must show (1) that error occurred, (2) that the error is plain, (3) that the error affected his substantial rights, and (4) that the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1137 (10th Cir. 2017) (en banc) (quoting *United States v. Mike*, 632 F.3d 686, 691–92 (10th Cir. 2011)). As we explain, Marquez cannot show that the district court erred.

First, although Marquez insists that it was "unusual" for the district court to question a witness, Aplt. Br. 10, 30, a district court's "authority to question witnesses

14

is . . . beyond dispute," *United States v. Albers*, 93 F.3d 1469, 1485 (10th Cir. 1996); *see also* Fed. R. Evid. 614(b) ("The [district] court may examine a witness regardless of who calls the witness."). Here, the district court asked Billhymer one question. Billhymer testified, when discussing one of the intercepted calls, that Marquez' reference to "four for 32," was a reference to purchasing four ounces of methamphetamine for $3,200 as opposed to four pounds for $32,000. R. vol. 3, 182. The district court asked her how she reached that conclusion, in light of earlier testimony that Christner previously purchased one pound for $8,000, such that four pounds would have been $32,000. In response, Billhymer admitted that the reference to "four for 32" could have been to four pounds but explained that the context indicated it was a reference to four ounces; Christner, who usually dealt in pounds, hadn't seemed satisfied with the quantity.

Marquez insists that the district court's question was improper and prejudiced the jury against him. Specifically, he contends that the question made it appear to the jury that the court thought Marquez was dealing in pounds of methamphetamine. Marquez is correct that judges can overstep the bounds of their authority in questioning witnesses. *See, e.g.*, *United States v. Bland*, 697 F.2d 262, 264–66 (8th Cir. 1983) (finding that judge's questioning constituted reversible error because court essentially took over cross-examination for government). For example, when questioning witnesses, judges should "take care not to create the appearance that [they are] less than totally impartial." *Albers*, 93 F.3d at 1485; *see also* Fed. R. Evid.

15

614(b) advisory committee's note to 1972 proposed rules (noting that district court can't "abandon[] [its] proper role and assume[] that of advocate").

But contrary to Marquez' assertion, the district court's question here didn't create the appearance of impartiality; it merely clarified a factual matter. *See Albers*, 93 F.3d at 1486 ("We have noted the propriety of questioning by the court to clarify testimony . . . ."); *cf. United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989) (finding no error in district court's suggestion that government call another witness because "[i]t is the very function of the trial court to establish the facts as clearly and completely as possible"; explaining that "[b]y seeking additional evidence . . . the court in no way displayed a predisposition towards the government's position"). In fact, when Marquez' counsel began his cross-examination of Billhymer immediately following the district court's question, he noted: "That's actually one of the things I was going to ask you, too." R. vol. 3, 183.

Marquez doesn't cite any cases from this Circuit to support his argument that the district court erred in asking this question, and the cases he does cite are easily distinguishable: each involved a district court going far beyond asking a single question clarifying a factual matter. *See Quercia v. United States*, 289 U.S. 466, 468, 472 (1933) (reversing conviction because district court told jury that he believed witness lied); *United States v. Ottaviano*, 738 F.3d 586, 595–98 (3d Cir. 2013) (finding error in extensive and aggressive questioning by court but declining to reverse because the questions occupied a fraction of record and the evidence against defendant was overwhelming); *United States v. Godwin*, 272 F.3d 659, 674–75, 679–

16

81 (4th Cir. 2001) (assuming district court erred by extensively cross-examining testifying defendant, expressing doubt about defendant's veracity, and rehabilitating government witnesses but finding no prejudice); *United States v. Beaty*, 722 F.2d 1090, 1095–96 (3d Cir. 1983) (reversing one conviction because district court's "overzealous examination" of key defense witness, including questions unrelated to crimes charged or substance of witness' testimony, gave impression that judge didn't believe witness).

Here, the district court's question did not advocate for the government or create the impression of impartiality. Rather, the question merely sought clarification of a factual matter—a factual matter that even defense counsel thought would benefit from such clarification. *See Albers*, 93 F.3d at 1486. Thus, we conclude that the district court did not err. And because we find no error, we need not consider the remaining steps of plain-error review. *See United States v. Fabiano*, 169 F.3d 1299, 1305 (10th Cir. 1999).

## III. The DEA Agents' Testimony

Marquez next challenges the admission of certain testimony from Agents Billhymer and Becknell. We consider each of his challenges in turn.

### A. Christner's Out-of-Court Statements

Marquez first suggests that some of Billhymer's testimony violated the Confrontation Clause.[2] We review this issue de novo. *United States v. Garcia*, 793

---

[2] Marquez' opening brief includes a single sentence on this issue and fails to explain why Billhymer's testimony violated the Confrontation Clause. Nor does

F.3d 1194, 1211 (10th Cir. 2015).

The specific testimony at issue here involved a single question and a single answer. The prosecutor asked Billhymer what she learned during an interview that she conducted with Christner before his death.[3] Marquez' counsel objected on Confrontation Clause grounds, and the district court ruled that it would permit the government to "go a little bit down this path, but [it didn't] know how far." R. vol. 3, 243. The prosecutor then rephrased her question and asked Billhymer, "Did that conversation [with Christner] confirm generally what you believed you understood from the investigation about the structure of . . . Christner's drug business?" *Id.* Billhymer said, "Yes." *Id.* And then the prosecutor moved on. Later, on cross-examination, Marquez' counsel elicited from Billhymer that Christner never implicated or named Marquez during the interview.

The Confrontation Clause of the Sixth Amendment guarantees criminal defendants the right to confront the witnesses against them. *See* U.S. Const. amend VI; *Crawford v. Washington*, 541 U.S. 36, 42 (2004). And the primary concern of the Confrontation Clause is "testimonial hearsay," which includes out-of-court

Marquez provide the applicable standard of review. *See* Fed. R. App. P. 28(a)(8) (requiring argument to include "appellant's contentions and the reasons for them" as well as "a concise statement of the applicable standard of review"). As such, we could consider this argument waived and decline to consider it. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that . . . are inadequately presented[] in an appellant's opening brief."). Nevertheless, we elect to consider the argument on the merits. *See United States v. Pam*, 867 F.3d 1191, 1200 n.7 (10th Cir. 2017) (noting that appellate court has discretion to consider merits of inadequately briefed argument).

[3] Recall that, several months before the government indicted Marquez, Christner died from complications following heart surgery.

18

statements, offered for their truth, made during a police interrogation. *Crawford*, 541 U.S. at 53. Here, the government conceded at oral argument that Billhymer's statement involved testimonial hearsay and violated the Confrontation Clause.

But not all Confrontation Clause violations warrant relief; such errors can be harmless, as the government argues is the case here. A Confrontation Clause violation is harmless if it's clear beyond a reasonable doubt that "the properly admitted evidence of guilt is so overwhelming" that "the prejudicial effect of the improperly admitted evidence is . . . insignificant by comparison." *United States v. Edwards*, 782 F.3d 554, 560–61 (10th Cir. 2015) (quoting *United States v. Becker*, 230 F.3d 1224, 1230 (10th Cir. 2000)).

Here, Billhymer's limited testimony about what Christner told her was insignificant in the context of the other evidence against Marquez. *See United States v. Chavez*, 481 F.3d 1274, 1278 (10th Cir. 2007) (finding Confrontation Clause violation harmless in part because the testimony "was relatively unimportant to the government's case" and "[t]he government provided ample evidence to support the conspiracy charge"). The government presented 21 intercepted phone calls and 11 text messages involving Marquez—calls and texts that, in context, show Marquez participating in conversations with Christner and others about buying and selling methamphetamine. Thus, as Marquez' counsel argued to the jury in closing and argues elsewhere in this appeal, the case against Marquez turned largely on whether the jury believed it was Marquez' voice on the calls. And Billhymer's brief description of the interview with Christner didn't identify either Marquez or the

19

substance of any of the intercepted calls. Further, Marquez' counsel elicited on cross-examination that Christner didn't name Marquez as a coconspirator.

Marquez asserts that Billhymer's testimony about Christner's interview was "the lynchpin used by the [g]overnment and its law[-]enforcement witness to 'confirm' its theory of the case and speculations against Marquez." Rep. Br. 16 (quoting R. vol. 3, 243). But the intercepted calls in which Marquez discussed buying and selling methamphetamine were far more essential to the government's case and more damning to Marquez' defense. And notably, in its closing argument, the government didn't even mention Billhymer's interview of Christner. Instead, it replayed excerpts from the intercepted calls. *See Chavez*, 481 F.3d at 1278 (noting as part of harmlessness inquiry that neither party mentioned improper testimony in closing). In sum, any prejudicial effect created by Billhymer's testimony that Christner "confirm[ed] generally" the details of her investigation was insignificant when compared to the overwhelming evidence against Marquez as reflected in the intercepted calls. R. vol. 3, 243. Thus, any error in the district court's decision to admit that testimony was harmless beyond a reasonable doubt. *See Edwards*, 782 F.3d at 560–61.

## B. Marquez' Role in the Conspiracy

Marquez next challenges the admission of Billhymer's testimony about Marquez' role in the conspiracy.[4] Billhymer twice testified specifically about Marquez' role. First, early in the trial, Billhymer testified that as of March 2013, based on intercepted calls and surveillance, she believed that Marquez distributed methamphetamine he received from Christner. Billhymer later repeated this assertion, testifying that as of June 2013, she believed that Marquez was one of Christner's distributors.

Because Marquez' counsel objected below, we review the admission of this evidence for an abuse of discretion. *See United States v. Brooks*, 736 F.3d 921, 929 (10th Cir. 2013). A district court abuses its discretion when its decision is "arbitrary, capricious, whimsical[,] or manifestly unreasonable." *United States v. Banks*, 761 F.3d 1163, 1197 (10th Cir. 2014).

Federal Rule of Evidence 701 governs lay opinion testimony, which must be (1) "rationally based on the witness's perception," (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and (3) "not based on scientific, technical, or other specialized knowledge." The purpose of Rule 701 is "to exclude testimony where the witness is no better suited than the jury to make the judgment at issue, providing assurance against the admission of opinions [that] merely tell the jury what result to reach." *Brooks*, 736 F.3d at 931 n.2 (quoting

---

[4] We note, again, that we elect to consider the merits of Marquez' argument despite his inadequate opening brief, which does little more than recite the testimony he purports to challenge. *See Pam*, 867 F.3d at 1200 n.7.

*United States v. Meises*, 645 F.3d 5, 16 (1st Cir. 2011)).

Relying on *United States v. Williams*, 827 F.3d 1134 (D.C. Cir. 2016), Marquez asserts that because Billhymer had no personal knowledge of Marquez' role in the conspiracy, she couldn't testify about that role as a lay opinion witness. *See* Fed. R. Evid. 701(a) advisory committee's notes to 1972 proposed rules (noting "the familiar requirement of first-hand knowledge or observation"). In *Williams*, the D.C. Circuit concluded that certain lay opinion testimony wasn't proper because the witness didn't disclose the "objective bases" for his opinions. *See* 827 F.3d at 1159.

We're not bound by the D.C. Circuit's objective-basis rule. *See Jordan v. Sosa*, 654 F.3d 1012, 1034 (10th Cir. 2011) (noting that this court isn't "bound by opinions handed down in other circuits" (quoting *Hill v. Kan. Gas Serv. Co.*, 323 F.3d 858, 869 (10th Cir. 2003))). And even assuming we agreed to follow that rule here, Marquez wouldn't be entitled to relief. As the government points out, Billhymer had an objective basis for her conclusions in this case: she testified based on her own perception of Marquez' role, which she gleaned from personally listening to "[h]undreds of hours of [intercepted] calls." R. vol. 3, 38; *cf. Brooks*, 736 F.3d at 934 (noting that "witness[ing] a controlled drug purchase" would establish an officer's "firsthand knowledge").

Specifically, one of the first calls the government played for the jury included Marquez and Christner discussing the distribution of methamphetamine that Marquez received from Christner. Shortly thereafter, on redirect examination, Billhymer testified that the intercepted calls up to this point led her to believe that Marquez was

a distributor for Christner. Likewise, Billhymer's second statement about Marquez'

role was also based on an intercepted call. The government played a call in which

Marquez asked Christner to save him an ounce and a half of methamphetamine.

Billhymer then explained that, based on this call, she believed Marquez' role was

distributing methamphetamine for Christner. Thus, Billhymer's lay opinion testimony

was based on her personal observations, and the district court did not abuse its

discretion in admitting it.[5]

### C.     Billhymer's Code-Word Testimony

Marquez next challenges Billhymer's testimony about the meaning of code

words used in the intercepted calls. Because Marquez didn't object to this testimony

during trial, we apply plain-error review. *See Brooks*, 736 F.3d at 929–30.

Marquez argues that Billhymer's code-word testimony was expert testimony

improperly masquerading as lay testimony. He insists that her explanation of code-

word meanings was based on her general law-enforcement experience rather than her

---

[5] In his opening brief, Marquez also argues that "[a]fter nearly every recording played, the prosecutor asked . . . Billhymer to tell the jury what it really meant." Aplt. Br. 38. In support, he provides a string cite to various locations in the record where Billhymer made these additional and allegedly impermissible statements.

But we need not consider this broader argument. Marquez forfeited any challenge to the statements listed in his string cite because his counsel failed to object to them at trial. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127–28 (10th Cir. 2011). And although we can review forfeited arguments for plain error, Marquez "fail[ed] to argue for plain error" on appeal. *Id.* at 1131. He therefore waived any argument that admitting these statements satisfied this standard. *See McKissick v. Yuen*, 618 F.3d 1177, 1189 (10th Cir. 2010) (concluding that if appellant forfeits an argument and then "fail[s] to explain in [his or] her opening appellate brief . . . how they survive the plain[-]error standard," appellant thereby "waives the argument[] in *this* court").

personal knowledge and was therefore inadmissible under Rule 701. *See United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011) (noting that someone "may testify as a lay witness *only if* [her] opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person" (emphasis added) (quoting *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004))). But as just explained, Billhymer's testimony about Marquez' role in the conspiracy was based on the personal knowledge she acquired from listening to "[h]undreds of hours of calls" while overseeing this investigation. R. vol. 3, 38. It's likewise reasonable to conclude that while listening to these calls, Billhymer became personally familiar with the meaning of the coded language that Marquez and Christner used to discuss methamphetamine.

Contrary to Marquez' assertion, this was not a situation in which Billhymer's knowledge about the meaning of coded drug language was based on past investigations; her testimony was based on what she learned during *this* investigation. *See United States v. Miranda*, 248 F.3d 434, 441 (5th Cir. 2001) (noting that law-enforcement officer could testify as nonexpert about meaning of code words based on personal perception developed from his "extensive participation in the investigation of [the] conspiracy, including . . . the monitoring and translating of intercepted telephone conversations"). Moreover, even if we were to assume that the district court erred in admitting some part of Billhymer's testimony, we would decline to find that the error was plain. To be plain, an error must violate the well-settled law of the Supreme Court or this circuit. *See Brooks*, 736 F.3d at 930. And Marquez hasn't

24

pointed us to any Supreme Court or Tenth Circuit authority finding error in testimony like this. Thus, we decline to find that the district court erred, plainly or otherwise, in admitting Billhymer's testimony about the meaning of the code words in this case.

### D.    Agent Becknell's Lay and Expert Testimony

Marquez also challenges some of Agent Becknell's testimony, asserting that it improperly conflated lay and expert testimony. Marquez again acknowledges that he didn't object to this testimony below and urges us to find plain error. *See id.* at 929–30.

Like Billhymer, Becknell testified about the meaning of certain code words in drug culture. But unlike Billhymer, Becknell testified as an expert under Federal Rule of Evidence 702. His particular expertise was "in organizational structure and the use of terminology in methamphetamine organizations." R. vol. 3, 307.

A district court may permit expert testimony if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In drug cases, expert testimony is often admitted to help the jury understand drug terminology. *See United States v. Quintana*, 70 F.3d 1167, 1171 (10th Cir. 1995) ("This [c]ourt has repeatedly held that in narcotics cases, expert testimony can assist the jury in understanding transactions and terminology.").

Relying on *United States v. Garcia*, 752 F.3d 382 (4th Cir. 2014), Marquez complains that Becknell's testimony was both generalized from his work as a law-enforcement officer with experience investigating methamphetamine crimes *and*

25

specifically derived from his supervision of Billhymer's investigation in this particular case. In *Garcia*, the Fourth Circuit reversed the defendant's convictions because an expert who testified about the meaning of coded language conflated that expert testimony with fact testimony based on her knowledge of the case. *See id.* at 391–92.

But even if we assume that Becknell similarly conflated lay and expert testimony, any error in admitting that testimony wasn't plain. For an error to be plain and contrary to well-settled law, either this court or the Supreme Court must have addressed the issue. *See Brooks*, 736 F.3d at 930. *Garcia*, a Fourth Circuit case, doesn't establish the well-settled law of this circuit. In fact, we've expressly approved the admission of similar testimony. *See Quintana*, 70 F.3d at 1171 (finding district court didn't abuse its discretion when it admitted expert testimony about "the meaning of the conversations recorded on the wiretap tapes"). Thus, the district court did not plainly err in admitting Becknell's testimony.

### E.  Overview Testimony

Finally, Marquez also generally objects to "[n]early the entirety of [Billhymer's and Becknell's] respective testimonies" as improper overview testimony. Rep. Br. 22. He didn't raise this objection below, so plain-error review again applies. *See Brooks*, 736 F.3d at 929–30.

Overview testimony is related to opinion testimony, but it's "a broader category of evidence." *Id.* at 930. It's generally offered at the beginning of a trial, "before there has been any evidence admitted for the witness to summarize." *Id.*

(quoting *United States v. Griffin*, 324 F.3d 330, 349 (5th Cir. 2003)). Overview testimony usually comes from a government witness who previews the government's case by explaining how an investigation began, which law-enforcement agencies were involved, and which investigative techniques they used. *See id.* We generally permit overview testimony, but it is subject to abuse, such as when an overview witness testifies based on hearsay rather than on personal knowledge or when an overview witness offers an opinion on the defendant's guilt. *Id.*

Marquez argues against the use of overview testimony generally, stating that its use is "a disturbing trend in these drug conspiracy cases." Aplt. Br. 41. In support, he cites three cases from the First Circuit disapproving of such testimony. *See Meises*, 645 F.3d 5; *United States v. Flores-de-Jesús*, 569 F.3d 8 (1st Cir. 2009); *United States v. Casas*, 356 F.3d 104 (1st Cir. 2004).

For two reasons, we reject Marquez' argument and reliance on these out-of-circuit cases. First, as the government asserts, Marquez doesn't identify any particular testimony from either Billhymer or Becknell that qualifies as overview testimony, let alone explain why that particular overview testimony was improper. *Cf. United States v. Kamahele*, 748 F.3d 984, 1000 (10th Cir. 2014) (rejecting Confrontation Clause challenge because appellants "generally describe[d]" the witness' testimony but didn't "identify the parts that involved the recitation of testimonial hearsay"). As such, we could treat this issue as inadequately briefed and decline to consider it. *See* Fed. R. App. P. 28(a)(8)(A) (requiring appellant's brief to contain "appellant's contentions and the reasons for them, with citations to the . . .

27

parts of the record on which the appellant relies"); *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1137 n.16 (10th Cir. 2014) (finding undeveloped argument waived).

Second, any error in admitting any alleged overview testimony wasn't plain because the First Circuit cases on which Marquez relies don't establish the well-settled law of this circuit. *See Brooks*, 736 F.3d at 930 ("[F]or an error to be [plain and] contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." (quoting *Thornburgh*, 645 F.3d at 1208)). In *Brooks*, we referenced these three First Circuit cases, but we held that the defendant couldn't show plain error under Tenth Circuit caselaw because "none of our prior cases have condemned unobjected-to overview testimony to the extent defendants now request." *Id.* at 930–32, 931 n.2. Similarly, here, any error in admitting Billhymer's testimony wasn't plain under our prior caselaw. Thus, we reject Marquez' generalized assertion that Becknell's or Billhymer's testimony constituted improper overview testimony.

**Conclusion**

To summarize, we reject each of Marquez' challenges on appeal. The evidence was sufficient for a rational jury to conclude that Marquez used a phone to facilitate a drug felony on four occasions; that he was a member of a conspiracy to distribute over 500 grams of methamphetamine; and that on March 16, he possessed methamphetamine with intent to distribute. And the district court didn't err when it asked a witness one question to clarify a factual matter. Nor did it abuse its discretion

or plainly err in admitting testimony from government agents. Accordingly, we affirm.