**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

OMAR HUMBERTO GONZALEZ-
HERNANDEZ, a/k/a Omar Gonzalez,
a/k/a Omar Humberto-Gonzales,

    Defendant - Appellant.

No. 19-1226
(D.C. No. 1:18-CR-00266-PAB-4)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **BALDOCK**, and **CARSON**, Circuit Judges.
_____

Omar Humberto Gonzalez-Hernandez appeals his conviction for conspiring to distribute methamphetamine. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I. BACKGROUND

The evidence presented to the jury showed that from October 2016 to May 2018, a group of individuals, including Gonzalez-Hernandez, conspired to distribute methamphetamine from Colorado to Virginia. The government's primary witness was Christina Fitzgerald, a member of the conspiracy who pleaded guilty and agreed to cooperate with the government. In 2012, Fitzgerald met Joanna Zarate-Suarez, another member of the conspiracy, while they were incarcerated in Wisconsin. Zarate-Suarez and Gonzalez-Hernandez are husband and wife.

Fitzgerald met Christopher Karten in 2013, when they were residing at a halfway house. In 2016, after their release from the halfway house, Karten contacted Fitzgerald to see if she could obtain two pounds of methamphetamine. At the time, both Fitzgerald and Karten were living in Virginia. To that end, Fitzgerald contacted Zarate-Suarez, who was then living in Colorado, about buying the methamphetamine. According to Fitzgerald, she and Karten planned to meet Jeremiah Serr, Zarate-Suarez's courier and coconspirator, in Kansas City to exchange the money for the drugs; however, Serr never showed up. Later, Fitzgerald and Karten drove to Colorado and bought the methamphetamine directly from Zarate-Suarez and another coconspirator, Edwin Roman-Acevedo.

Fitzgerald testified that Zarate-Suarez told her Serr missed the meeting because he was stopped by police. The government presented testimony from the law-enforcement officer who stopped Serr's vehicle in Kansas and discovered a

2

thermos containing a crystal substance he believed to be methamphetamine. Subsequent testing revealed the thermos contained about a pound of methamphetamine. Serr pleaded guilty to a state charge for possessing methamphetamine with intent to distribute and spent several months incarcerated in Kansas.

The following month, Fitzgerald and Sarah MaGuire, Karten's girlfriend, flew from Virginia to Colorado with $16,000 to buy more methamphetamine from Zarate-Suarez. But instead of selling more methamphetamine, Zarate-Suarez, Gonzalez-Hernandez, and Fitzgerald came up with a plan to rob MaGuire. The trio then enlisted Roman-Acevedo and two other men to assist with the robbery. Roman-Acevedo and the two men picked up MaGuire at her hotel on the pretense of taking her to buy cigarettes, then beat her up and dumped her on the side of the road. While MaGuire was out, Fitzgerald entered MaGuire's hotel room and took her belongings, including the $16,000. Gonzalez-Hernandez and Zarate-Suarez, who were waiting behind the hotel in a vehicle with its headlights turned off, picked up Fitzgerald and they met up with Roman-Acevedo. Zarate-Suarez paid Fitzgerald $500 and Roman-Acevedo and his cohorts smaller amounts and kept the rest of the money.

A few days later, Zarate-Suarez arranged for Fitzgerald, Roman-Acevedo, and another man, to drive to Virginia with half a pound of methamphetamine. Along the way they were stopped for speeding and Fitzgerald dumped the drugs into a jug of water to avoid arrest. When Fitzgerald got home to Virginia, she dried out the methamphetamine, kept some for her personal use and sold the rest. Not long

3

thereafter, Fitzgerald surrendered to the Bureau of Prisons to begin serving a 15-month sentence for violating the conditions of her supervised release.

After Fitzgerald completed her sentence in the spring of 2018, she resumed communications with Karten, who asked if she could obtain six pounds of methamphetamine. Unbeknownst to Fitzgerald, Karten was now working as an informant for law enforcement. Fitzgerald contacted Zarate-Suarez, who agreed to front her five pounds. Fitzgerald flew to Denver and was picked up at the airport by Zarate-Suarez and Gonzalez-Hernandez, who took her to a hotel. Upon her arrival in Denver, the Drug Enforcement Agency (DEA) began surveilling Fitzgerald, including monitoring the location of her cell phone.

The next day, Gonzalez-Hernandez and Zarate-Suarez took Fitzgerald to a restaurant where they discussed the terms of a drug deal with Karten. During the meeting, Gonzalez-Hernandez expressed opinions on drug pricing, whether to front the drugs to Karten, and where the sale would take place. They agreed that on May 9, Gonzalez-Hernandez would pick up the drugs from his source as soon as he got off work and the they would meet Karten in Burlington, Colorado, specifically at the Burlington Motor Inn, to consummate the sale. On the agreed-upon date, they went to Burlington to meet Karten, but he failed to show and they returned to Denver.

The following day, Karten sent Fitzgerald a message saying that his phone had been disconnected and he had stayed at a hotel down the street from the Burlington Motor Inn. The parties agreed to meet again, this time in Bennett, Colorado. Later that day, Fitzgerald, Zarate-Suarez, and Roman-Acevedo drove to Bennett with the

4

methamphetamine; Gonzalez-Hernandez, however, did not make the trip because he had to work.

On the drive to Bennett, the three were stopped by an Arapahoe County deputy sheriff who was accompanied by a K-9. The deputy walked the K-9 around the vehicle and got a positive alert. Zarate-Suarez told Roman-Acevedo to call Gonzalez-Hernandez and ask him what she should do. Zarate-Suarez then drove off, and a high-speed chase ensued. While Zarate-Suarez drove, her passengers dumped water into four gallon-sized zip-lock bags containing the methamphetamine and threw them out of the vehicle. The deputy eventually forced the vehicle off the road. DEA agents recovered four pounds of methamphetamine from the roadside, and Zarate-Suarez, Fitzgerald, and Roman-Acevedo were arrested.

Serr was arrested the next day on an outstanding warrant. Gonzalez-Hernandez was arrested two months later and charged with one count; specifically, conspiracy to distribute and possess with intent to distribute, more than 500 grams of a mixture and substance containing a detectable amount of methamphetamine and more than 50 grams of methamphetamine. Zarate-Suarez, Fitzgerald, and Roman-Acevedo entered guilty pleas. Gonzalez-Hernandez and Serr were tried together.[1] The jury convicted Gonzalez-Hernandez and the district court sentenced him to the statutory minimum ten years in prison, *see* 21 U.S.C. § 841(b)(1)(A)(viii).

---

[1] Serr was convicted on two counts: (1) conspiracy and (2) possession of methamphetamine with intent to distribute. We affirmed his convictions in *United States v. Serr*, --- F. App'x ---, 2020 WL 3095902, at *6 (10th Cir. June 11, 2020) (unpublished).

5

## II. DISCUSSION

Gonzalez-Hernandez argues for reversal of his conspiracy conviction on the same grounds he advanced in his motion for acquittal; namely, there was insufficient evidence to support the existence of a single, large conspiracy. Relatedly, Gonzalez-Hernandez also maintains there was a fatal variance between the indictment, which charged a single conspiracy, and the proof at trial, which established three separate conspiracies.

### A. Standard of Review

We review a challenge to the sufficiency of the evidence de novo, including a challenge that arises from the denial of a motion for acquittal under Fed. R. Crim. P. 29, "viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government." *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015) (internal quotation marks omitted). "We will reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (internal quotation marks omitted). "In conducting this review we may neither weigh conflicting evidence nor consider the credibility of witnesses. It is for the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented." *Id*. (internal quotation marks omitted).

We likewise "review de novo the question whether a fatal variance occurred, viewing the evidence and drawing all reasonable inferences in the light most favorable to the government." *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1116

6

(10th Cir. 2011).  That is because "[w]e treat a conspiracy variance claim as an attack on the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy," *United States v. Hill*, 786 F.3d 1254, 1266 (10th Cir. 2015) (internal quotation marks omitted).

**B.  Analysis**

### 1.  Conspiracy

"To prove a conspiracy, the government must demonstrate:  (1) . . . two or more persons agreed to violate the law, (2) . . . the defendant knew at least the essential objectives of the conspiracy, (3) . . . the defendant knowingly and voluntarily became a part of it, and (4) . . . the alleged coconspirators were interdependent."  *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) (internal quotation marks omitted).

Gonzalez-Hernandez embarks on a three-prong attack regarding the sufficiency of the evidence to establish his participation in a single, large conspiracy. First, he maintains there was no evidence he was part of the earliest transaction when Serr was dispatched by Zarate-Suarez to Kansas City to deliver methamphetamine to Karten.  But it is irrelevant whether Gonzalez-Hernandez participated in each transaction.  "A single conspiracy does not splinter into multiple conspiracies because members come and go."  *United States v. Fishman*, 645 F.3d 1175, 1190 (10th Cir. 2011).

Next, Gonzalez-Hernandez argues the government "did not prove beyond a reasonable doubt that the May 2018 conspiracy was a continuation of the October

7

2016 and November 2016 conspiracies." Aplt. Opening Br at 15. He relies on our decision in *Caldwell*, which explains that "[a]lthough a lapse in time does not necessarily convert a single conspiracy into multiple conspiracies, time in combination with other factors can sever the single continuous conspiracy alleged in the indictment into two separate conspiracies." 589 F.3d at 1330-31 (internal quotation marks omitted). He asserts "there was an 18-month lapse in time between the November 2016 transaction and the May 2018 transaction, which in combination with other factors, established at least two separate conspiracies." Aplt. Opening Br. at 16.

In particular, Gonzalez-Hernandez maintains the alleged single conspiracy came to an end in late 2016, when Fitzgerald went to prison. In this regard, he points to Fitzgerald's testimony that "when she was incarcerated in December 2016, she was not aware of any contact between Karten and the Denver group, and she had lost contact with Zarate-Suarez." *Id.* at 17. A single conspiracy, however, does not become multiple conspiracies merely because there is a lapse in time between transactions. *See United States v. Williamson*, 53 F.3d 1500, 1514 (10th Cir. 1995) (holding that a seven-month hiatus did not sever a single conspiracy into two separate conspiracies, where "operations resumed with the same participants, the same conspiratorial objective and the same course of conduct"). Here, the evidence established that shortly after Fitzgerald was released from prison in 2018, the same participants resumed the same plan—the sale of methamphetamine to Karten.

8

Finally, Gonzalez-Hernandez relies on Fitzgerald's testimony that there were three separate agreements, and therefore, three separate conspiracies. But the existence and scope of a conspiracy is a question to be answered by the jury—not a fact witness. *See Caldwell*, 589 F.3d at 1329 (noting that because "[d]istinguishing between a single, large conspiracy and several smaller conspiracies is often difficult[,] we will generally defer to the jury's determination of the matter").

Thus, contrary to Gonzalez-Hernandez's arguments, a reasonable jury could have concluded that he was a member of a single, larger conspiracy to distribute methamphetamine from Colorado to Virginia that stretched from October 2016 to May 2018 and involved Zarate-Suarez, Fitzgerald, Serr, and Roman-Acevedo.

## 2. Variance

"A variance arises when an indictment charges a single conspiracy but the evidence presented at trial proves only the existence of multiple conspiracies." *United States v. Carnagie*, 533 F.3d 1231, 1237 (10th Cir. 2008). But "[e]ven if we determine that a variance occurred, we need not reverse . . . unless we determine that the defendant was substantially prejudiced by the variance." *Hill*, 786 F.3d at 1266. One way a variance can be prejudicial is "by causing the jury to determine the defendant's guilt by relying on evidence presented against other defendants who were involved in separate conspiracies (the so-called spillover effect)." *Id*. (internal quotation marks omitted).

According to Gonzalez-Hernandez, there was a variance between the indictment, which charged a single conspiracy, and the evidence at trial, which

established three separate conspiracies.  He further maintains he was prejudiced by the spillover effect of evidence regarding:  (1) Serr's arrest while on his way to Kansas City; (2) the robbery and beating of MaGuire; and (3) Fitzgerald and Roman-Acevedo dumping methamphetamine into a jug of water to avoid arrest when they were stopped by law enforcement on their way to deliver drugs to Karten.

As explained *infra*, the evidence at trial was sufficient for a reasonable jury to find the existence of the conspiracy as charged.  And because there was no variance, we need not reach the question of prejudice.  *See United States v. Marquez*, 898 F.3d 1036, 1043 (10th Cir. 2018) (explaining that where the record supports the jury's determination there was only a single conspiracy, and therefore no variance, we do not reach the question of prejudice).

### III.  CONCLUSION

We affirm Gonzalez-Hernandez's conviction.

Entered for the Court

Gregory A. Phillips
Circuit Judge